

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IMMIGRANT DEFENDERS LAW
CENTER, et al.,

          Plaintiffs,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

          Defendants.

Case No. CV 21-0395 FMO (RAOx)

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

## BACKGROUND

This is an action challenging the policies and conduct of the U.S. Department of Homeland Security ("DHS"), the Secretary of Homeland Security, U.S. Customs and Border Protection ("CBP"), the CBP Commissioner, U.S. Immigration and Customs Enforcement ("ICE"), the Director of ICE, U.S. Enforcement and Removal Operations ("ERO"), and the Acting Executive Associate Director of ERO (collectively, "defendants"), relating to unaccompanied noncitizen children who previously entered the United States with their families, were placed in removal proceedings with their families, were sent to Mexico to await their proceedings pursuant to the Migrant Protection Protocols ("MPP") policy, and later returned to the United States without a parent or guardian – as unaccompanied children (hereinafter, "MPP-unaccompanied children"). (See Dkt. 14, Amended Complaint for Declaratory and Injunctive Relief ("FAC") at ¶¶ 43-56).

The Immigrant Defenders Law Center ("ImmDef"), Refugee and Immigrant Center for Education and Legal Services ("RAICES"), South Texas Pro Bono Asylum Representation Project ("ProBar"), and The Door (collectively, "plaintiffs"), (see Dkt. 14, FAC at ¶¶ 17-42), brought this action seeking "to ensure that unaccompanied immigrant children" receive the "protections enshrined by the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Flores Settlement Agreement." (Id. at ¶¶ 1 & 13). Plaintiffs are legal services providers asserting claims for violations of: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, (see id. at ¶¶ 243-257); and (2) the Due Process Clause. (See id. at ¶¶ 226-233). The court held a bench trial, and this Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).[1]

## THRESHOLD ISSUES

I.    THE RECORD.

As an initial matter, the court addresses defendants' objections to the inclusion of extra-record evidence. (See, e.g., Dkt. 284, Reporter's Transcript of Bench Trial on November 7, 2023 ("Tr.") at 20:10-12). "In general, a court reviewing agency action under the APA must limit its review to the administrative record." San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 992 (9th Cir. 2014) (citing Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244 (1973)). However, the court "may consider extra-record evidence where admission of that evidence (1) is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) is necessary to determine whether the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." Id. (internal quotation marks omitted). In addition, where "plaintiffs have a constitutional claim that exists outside of the

---

[1]  To the extent any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]." Tri-Tron Int'l v. Velto, 525 F.2d 435, 435 (9th Cir. 1975).

APA, then the APA's administrative record requirement does not govern . . . consideration of other extra-record evidence." Rueda Vidal v. U.S. Dep't of Homeland Sec., 536 F.Supp.3d 604, 612 (C.D. Cal. 2021); see California v. U.S. Dep't of Homeland Sec., 612 F.Supp.3d 875, 896-97 (N.D. Cal. 2020).[2]    Here, the court permitted "limited, tailored discovery relevant to Plaintiffs' failure-to-act, Accardi, and due process claims[.]"  (Dkt. 82, Court's Order of December 8, 2021, at 3).

The court admitted extra-record evidence for the following limited purposes:  (1) to enable plaintiffs to establish standing, see, e.g., Cent. Sierra Env't Res. Ctr. v. U.S. Forest Serv., 916 F.Supp.2d 1078, 1086 (E.D. Cal. 2013) (A court "may consider extra-record evidence that allows plaintiffs to establish standing.") (citing Nw. Env't Defense Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1527-28 (9th Cir. 1997)); (2) to determine whether the agency considered all relevant factors and explained its decision,[3] see San Luis & Delta-Mendota Water Auth., 776 F.3d at 992; (3) to evaluate plaintiffs' due process claims regarding the Policy's implementation, see Rueda Vidal, 536 F.Supp.3d at 612); see, e.g., Immigrant Defs. L. Ctr. v. Mayorkas, 2024 WL 2103964, *10 (C.D. Cal. 2024) (distinguishing between APA claims concerning pre-decisional conduct and due process claims concerning post-implementation conduct); Vidal v. Duke, 2017 WL 8773110,

---

[2]  There is some disagreement as to when a constitutional claim exists outside of an APA claim or overlaps to such an extent that it should be subject to the APA's record requirement. (See Dkt. 82, Court's Order of December 8, 2021, at 3) (noting disagreement among courts and "agree[ing] with district courts that have taken flexible approaches depending on the facts and claims in the case at hand"); Rueda Vidal, 536 F.Supp.3d at 612 ("There is no controlling authority as to whether constitutional claims governed by the APA should be decided on the administrative record without additional evidence. . . .  The Court thus examines the necessity of additional evidence on a case by case basis."); Chiayu Chang v. U.S. Citizenship & Immigr. Servs., 254 F.Supp.3d 160, 161-62 (D.D.C. 2017) (noting disagreement among district courts as to whether the assertion of constitutional claims takes a case outside of the APA record review rule).

[3]  Given the lack of information about MPP-unaccompanied children in the record, limited extra-record evidence was allowed so that the court could "develop a background against which it [could] evaluate the integrity of the agency's analysis" and "understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." San Luis & Delta-Mendota Water Auth., 776 F.3d at 993.  This exception is "narrowly construed," and the court was careful not to rely on extra-record evidence "to determine the correctness or wisdom of the agency's decision."  See id.

1   *3 (E.D.N.Y. 2017) (same); <u>U.S. Dep't of Homeland Sec.</u>, 612 F.Supp.3d at 897 ("While plaintiffs'

2   APA and constitutional claims challenge the same Rule and request the same relief[,] . . . the

3   claims do not fundamentally overlap."); and (4) to aid in the court's consideration of the appropriate

4   scope of relief.  <u>See Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs</u>, 817 F.Supp.2d 1290, 1300

5   (D. Or. 2011) ("Courts may also consider extra-record evidence in determining whether a party

6   will suffer irreparable harm in the absence of injunctive relief.").  Ultimately, however, the court

7   relied primarily on the administrative record in reaching its decision.

8   II.    PLAINTIFFS' MOTION FOR SANCTIONS.

9        Plaintiffs seek sanctions pursuant to Federal Rule of Civil Procedure 37[4] based on

10   defendants' failure to supplement certain interrogatory responses regarding how many

11   MPP-unaccompanied children defendants have encountered and removed – in other words, data

12   on how many children have been impacted by the challenged policy.  (<u>See</u> Dkt. 273, Motion for

13   Sanctions Pursuant to Fed. R. Civ. P. 37 ("Sanctions Motion") at 1-2) (citing Fed. R. Civ. P.

14   37(b)(2)(A)(i), (c)(1)).  Plaintiffs' motion is based on the Court's Order of October 25, 2023, which

15   directed defendants to supplement specific interrogatory responses no later than October 31,

16   2023.  (<u>See</u> Dkt. 259, Court's Order of October 25, 2023, at 6).  In that Order, the court found that

17   defendants had violated their ongoing discovery obligations by failing to supplement interrogatory

18   responses that contained statistics that were more than a year old at the time of trial.  (<u>See id.</u> at

19   4-5).  The court also "admonishe[d] defendants that if they fail to comply with the court's order, the

20   court may impose sanctions, including . . . pursuant to Rule 37."  (<u>Id.</u> at 5 n. 5).  Plaintiffs request

21   as sanctions that certain designated facts be taken as established.  (<u>See</u> Dkt 273, Sanctions

22   Motion at 1-2 & 6).

23        Defendants failed to supplement the interrogatories by the court-ordered deadline, and did

24   not submit the information until <u>after</u> trial – on December 20, 2023 – nearly two months after the

25   court-ordered deadline, and one day after plaintiffs filed their Post-Trial Brief.  (<u>See</u> Dkt. 259,

26   Court's Order of October 25, 2023, at 6); (Dkt. 269, Minutes of Court Trial); (Dkt. 280, Plaintiffs'

27

28      [4] Unless otherwise indicated, all "Rule" references are to the Federal Rules of Civil Procedure.

Post-Trial Brief); (Dkt. 281, Defendants' Opposition to Plaintiffs' Motion for Sanctions Pursuant to Fed. R. Civ. P. 37 ("Sanctions Opp.").  Thus, plaintiffs were unable to evaluate and rely on the discovery responses during the bench trial or in their post-trial briefing.

In a single-page opposition, defendants concede that they did not supplement their responses by the deadline imposed by the court.  (See Dkt. 281, Sanctions Opp. at 1). Defendants nevertheless argue that sanctions should not be imposed because:  (1) "providing supplemental responses would not have been possible within the Court's deadline[;]" and (2) "Plaintiffs are not prejudiced by the timing of Defendants' supplements[,]" which were submitted nearly two months after the deadline.  (Id.).  Defendants' arguments are unpersuasive.

First, defendants never explain why they did not seek an extension of the deadline via a stipulation or an ex parte application when it became apparent to them that they would not be able to meet the court's deadline.  (See, generally, Dkt. 281, Sanctions Opp.).  Moreover, even if the court were to credit defendants' position that they were unable to comply with the deadline, that is a problem of their own making because defendants had an ongoing obligation to supplement their discovery responses, and their choice not to fulfill those obligations does not now mean they can evade the consequences of the position in which they put themselves.  See Fed. R. Civ. P. 26(e)(1) ("A party . . . who has responded to an interrogatory . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"); Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc., 2010 WL 2735694, *1 (E.D. Wis. 2010) (noting that a party must supplement discovery responses when it is aware of information that "undermine[s] the accuracy or completeness of its original discovery responses" under Rule 26(e)).

Second, plaintiffs were undoubtedly prejudiced by defendants' noncompliance with their discovery obligations and with the Court's Order of October 25, 2023, because, among other things, they were unable to rely on the discovery responses during trial or in preparing their post-trial briefing.  (See Dkt. 273, Sanctions Motion at 6); Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,

259 F.3d 1101, 1107 (9th Cir. 2001) ("Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness.").

Under Rule 37(b)(2)(A), permissible sanctions for failure to obey a discovery order include an order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims[.]"  See Fed. R. Civ. P. 37(b)(2)(A)(i).  The court is persuaded, under the circumstances here, that designating certain facts as established is an appropriate sanction.[5]  Accordingly, the court finds that the facts set forth in the next section with a citation to the Sanctions Motion shall be taken as established for purposes of this action.  See infra Findings of Fact at ¶¶ 29-32.

## FINDINGS OF FACT[6]

I.    PLAINTIFFS.

1.  The Department of Health and Human Services funds legal service providers to serve unaccompanied children in the custody of the Office of Refugee Resettlement ("ORR").  (See Dkt.

---

[5]  In their Reply in Support of Motion for Sanctions Pursuant to Fed. R. Civ. P. 37 (Dkt. 282, "Sanctions Reply"), plaintiffs request that the court also award attorneys' fees and costs pursuant to Rule 37(a)(5)(A).  (See id. at 4).  Rule 37(a)(5)(A) provides that if the motion for an order compelling disclosure or discovery is granted "or if the disclosure or requested discovery is provided after the motion was filed – the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  However, plaintiffs' request was made in connection with a motion for sanctions, not a motion to compel discovery.  See RG Abrams Ins. v. L. Offs. of C.R. Abrams, 342 F.R.D. 461, 521 (C.D. Cal. 2022) ("Rule 37(a)(5)(A) applies only to a motion to compel discovery in the first instance, not a motion for sanctions for a party's failure to comply with a discovery order issued under Rule 37(a).").  Since plaintiffs raised the issue of attorney's fees and costs in their Sanctions Reply, to which defendants had no opportunity to respond, the court will give plaintiffs an opportunity to file a motion for attorney's fees and costs under Rule 37(b)(2)(C) or any other applicable rule or statute.

[6]  Because the Certified Administrative Record (Exh. 46) spans three docket entries (Dkts. 279-5, 279-6 & 279-7), it will be cited in this Order as: (Dkt. X, Exh. 46, Name of Document (if applicable) at AR #).  Also, defendants raised boilerplate objections to virtually all of plaintiffs' exhibits.  (See Dkt. 210, Pretrial Exhibit Stipulation ("Exhibit Stipulation")).  As the court made clear early on in the case, "blanket or boilerplate objections to the opposing party's exhibits . . . will be disregarded and overruled."  (Dkt. 41, Court's Order of June 23, 2021, at 5).  Accordingly, unless otherwise specified, defendants' objections to plaintiffs' exhibits are overruled.

29-18, Declaration of Hannah P. Flamm [] ("Flamm Decl.") at ¶¶ 7-11 & 49); (Dkt. 14, FAC at ¶¶ 53 & 72, n. 24); (Dkt. 279-8, Exh. 140, Declaration of Toby Biswas at 2) (noting that ORR is part of HHS).

2. Plaintiffs are four legal service providers who, together, have represented thousands of unaccompanied children in immigration proceedings. (See Dkt. 29-18, Flamm Decl. at ¶¶ 7 & 10); (Dkt. 29-23, Declaration of Carly L. Salazar [] ("Salazar Decl.") at ¶¶ 4 & 7); (Dkt. 29-22, Declaration of Michelle Garza [] ("Garza Decl.") at ¶¶ 4-6); (Dkt. 29-19, Declaration of Yliana Johansen-Mendez [] ("Johansen-Mendez Decl.") at ¶¶ 13-15).

3. The Door is a New York-based nonprofit organization, whose mission is to empower New York City's diverse population of disconnected youth by providing them the tools they need to become successful. (See Dkt. 268, Pretrial Conference Order ("PTO") at ¶ 6.G.).[7] The Door offers legal assistance, among other social services, to nearly 11,000 youth annually. (See id. at ¶ 6.H.).

4. In 2003, ProBAR established the Children's Project, which focuses on providing direct services and legal representation to unaccompanied child clients detained in ORR shelters in south Texas. (See Dkt. 268, PTO at ¶ 6.I.). ProBAR is a leading expert on representing and assisting unaccompanied children, and has developed guides and videos on best practices for effectively engaging with young clients, providing "Know Your Rights" presentations, and conducting effective individual screening processes. (See id. at ¶ 6.J.).

5. ImmDef is one of the largest removal defense nonprofits in Southern California, and its Children's Representation Project – which includes the Detained Youth Empowerment Project – serves thousands of children each year. (See Dkt. 268, PTO at ¶ 6.K.). Encompassed in ImmDef's mission is the goal to ensure quality legal representation to unaccompanied minors in removal proceedings. (See id. at ¶ 6.L.).

---

[7] To the extent relevant, the court adopts and incorporates all of the parties' stipulated facts set forth in the PTO. (See Dkt. 268, PTO at 2-10).

6.    Every month, ImmDef provides legal screening for about 200 to 400 detained unaccompanied children to identify available forms of relief and immediate legal or social services needs. (See Dkt. 284, Tr. at 40:14-41:13). As of November 7, 2023, ImmDef represented at least 22 MPP-unaccompanied children in active cases. (See id. at 50:10-17).

7.    RAICES is a nonprofit, non-partisan organization whose mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities; and advocate for liberty and justice. (See Dkt. 268, PTO at ¶ 6.M.). RAICES's mission is to serve as many unaccompanied children as possible while providing the best possible legal counsel and trauma-sensitive, child-centric services. (See id. at ¶ 6.P.).

8. RAICES's Children's Program provides free legal services to unaccompanied children detained in ORR shelters throughout Texas and in emergency reception centers, and to designated unaccompanied children who have been released from detention and reside within RAICES's service area. (See Dkt. 268, PTO at ¶ 6.N.).

9. For both detained and released unaccompanied children, RAICES's Children's Program seeks to protect the children's legal rights as established by the TVPRA and other applicable laws. (See Dkt. 268, PTO at ¶ 6.O.). As of November 7, 2023, RAICES had provided legal services to over 100 MPP-unaccompanied children. (See Dkt. 284, Tr. at 55:14-17).

10.    Plaintiffs seek to protect and advance the rights of unaccompanied children through, among other things, the provision of quality legal services in immigration matters. (See Dkt. 206, June 20, 2023 Declaration of Marion Donovan-Kaloust [] ("Donovan-Kaloust Decl. II") at ¶ 2); (Dkt. 207, Declaration of Aimee Korolev ("Korolev Decl.") at ¶¶ 3 & 17); (Dkt. 203, Declaration of Gillian Menza ("Menza Decl.") at ¶¶ 6-10); (Dkt. 204, Declaration of Pablo Rodriguez ("Rodriguez Decl.") at ¶ 24); (Dkt. 29-22, Garza Decl. at ¶¶ 3 & 5).

II.    MIGRANT PROTECTION PROTOCOLS (MPP).

11.    In general, unless subject to a special procedure like expedited removal or reinstatement of removal, arriving noncitizens are placed in removal proceedings under § 240 of the Immigration and Nationality Act ("INA"). See 8 U.S.C. § 1229a(a). Known as § 240 proceedings, these are adversarial proceedings conducted before an immigration judge, in which

8

1  the noncitizen may assert claims for immigration relief defensively.  See id. at § 1229a(a)(1), §

2  1229a(c)(4); (Dkt. 268, PTO at ¶ 6.T).

3      12.  Under MPP, DHS placed certain noncitizen applicants for admission in § 240 removal

4  proceedings and returned those individuals to Mexico to await the dates of their hearings in those

5  proceedings.  (See Dkt. 268, PTO at ¶ 6.A.); (Dkt. 279-5, Exh. 46, Certified Administrative Record

6  ("AR"), U.S. Customs and Border Protection, Guiding Principles for Migrant Protection Protocols

7  (Jan. 28, 2019) ("MPP Guiding Principles") at AR 1-2).

8      13.  Beginning in 2019, when MPP started, thousands of children were processed through

9  MPP as part of a family unit.  (See Dkt. 279-7, Exh. 46, Migrant Protection Protocols Instructions

10  and Implementation Guidance at AR 2371) ("The alien's accompanying spouse and qualifying

11  children (immediate family members) should be processed together with the alien."); (Dkt. 279-5,

12  Exh. 46, MPP Guiding Principles at AR 1-2) (indicating that family units are not excluded from

13  MPP); (Dkt. 279-5, Exh. 46 at AR 386-87) (providing statistics on family units, including children,

14  apprehended at the border in 2019).

15      14.  Children and families processed through MPP were exposed to risks of violence and

16  insecurity while waiting in Mexico, which caused many individuals and families to abandon their

17  claims and incur in absentia removal orders.  (See, e.g., Dkt. 279-8, Exh. 71, Explanation of the

18  Decision to Terminate the Migrant Protection Protocols at 2, 6, 9, 12-14 & 18-20)[8] (describing

19  safety concerns, harm suffered, and prevalence of in absentia orders); (Dkt. 268, PTO at ¶ 6.U).

20  Noncitizens in MPP were statistically more likely to receive in absentia removal orders than

21  comparable noncitizens who were not processed through MPP.  (See Dkt. 268, PTO at ¶ 6.E.);

22

23  ───────────────

24      [8]  Pursuant to Fed. R. Evid. § 201, the court takes judicial notice of this memorandum.  See
    Shoshone-Bannock Tribes of Fort Hall Rsrv. v. Daniel-Davis, 2022 WL 595886, *2 (D. Idaho Feb.

25  28, 2022) (taking judicial notice of memoranda issued by the Environmental Protection Agency
    that was publicly available on its website); Teixeira v. Cty. of Alameda, 873 F.3d 670, 699 n. 6 (9th

26  Cir. 2017) ("[A] court may take judicial notice of matters of public record that are not subject to
    reasonable dispute[.]") (internal quotation marks omitted); United States v. 14.02 Acres, 547 F.3d

27  943, 955 (9th Cir. 2008) ("Judicial notice is appropriate for records and reports of administrative
    bodies.") (internal quotation marks omitted).

28

(see also Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701) ("[A]n estimated 30 percent of unaccompanied minors are ordered removed in absentia because they fail to appear at their initial or later hearings.").

III.    UNACCOMPANIED CHILDREN AND MPP.

15.  An unaccompanied child is a noncitizen under the age of 18 who does not have lawful immigration status in the United States and who has no parent or legal guardian available to provide care and physical custody in the United States.  See 6 U.S.C. § 279(g)(2).

16.  Plaintiffs have represented hundreds of MPP-unaccompanied children.  (See Dkt. 284, Tr. at 50:10-17 & 55:14-19).  MPP-unaccompanied children are likely to have experienced significant trauma – not only due to their experiences undergoing family separation, but also from the widespread trauma experienced by individuals returned to Mexico due to MPP.  (See Dkt. 279-8, Exh. 71, Explanation of the Decision to Terminate the Migrant Protection Protocols at 12-14) (describing harm suffered by individuals returned to Mexico due to MPP); (Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701-02) (noting that many unaccompanied children have experienced trauma, violence, and family separation).

17.  In designing their service programs, plaintiffs relied on their understanding that the TVPRA provides the following special protections to all unaccompanied children:  (1) the processing of asylum claims in the first instance as affirmative applications to be adjudicated by the United States Citizenship and Immigration Services ("USCIS") through a non-adversarial process; (2) extended timelines to develop claims for immigration relief, including exclusion from the one-year deadline that applies to applications for asylum; (3) access to legal counsel to the greatest extent practicable; (4) to the extent DHS seeks to remove an unaccompanied child, placement in § 240 removal proceedings, with access to child-sensitive procedures; (5) a guarantee that a child's prior removal orders would not be reinstated; and (6) the ability to elect voluntary departure.  (See Dkt. 284, Tr. at 44:1-11, 45:13-46:1); (Dkt. 29-20, May 14, 2021 Declaration of Marion Donovan-Kaloust ("Donovan-Kaloust Decl. I") at ¶ 19); (Dkt. 206, Donovan-

Kaloust Decl. II at ¶¶ 6-7); (Dkt. 205, Declaration of Diana Tafur ("Tafur Decl.") at ¶¶ 13-15); (Dkt. 29-22, Garza Decl. at ¶¶ 9 & 11-12).

18.   Recognizing that unaccompanied children have unique needs and that the TVPRA enshrines certain protections, plaintiffs' service models are designed to:  (1) allow time to develop rapport with their clients before preparing their claims for relief, which can take several months; (2) enter into formal representation for a limited group; (3) provide effective representation; and (4) serve a large number of children, which can require several months of work developing the record.  (See Dkt. 29-20, Donovan-Kaloust Decl. I at ¶¶ 11, 16 & 18-19); (Dkt. 203, Menza Decl. at ¶¶ 14 & 25); (Dkt. 29-22, Garza Decl. at ¶¶ 7-8 & 10-11); (Dkt. 205, Tafur Decl. at ¶¶ 10-11 & 13-14); (Dkt. 284, Tr. at 43:13-19).

19.   In the 16 months prior to the January 2019 implementation of MPP, CBP apprehended an average of approximately 4,385 unaccompanied children per month at the southwest border. (See Dkt. 279-5, Exh. 46 at AR 384 & 386) (averaging UAC border patrol apprehensions).

20.   DHS does not place unaccompanied children, as defined by 6 U.S.C. § 279(g)(2), in MPP.  (See Dkt. 268, PTO at ¶ 6.B.).

21.   DHS's stated policy is that unaccompanied children are "not amenable to MPP."  (See Dkt. 268, PTO at ¶ 6.C.); (Dkt. 279-5, Exh. 46, MPP Guiding Principles at AR 1) (stating that "[u]naccompanied alien children" "are not amenable to MPP"); (Dkt. 279-5, Exh. 46, Press Release, Migrant Protection Protocols (Jan. 24, 2019) at AR 14) ("Unaccompanied alien children . . . will not be subject to MPP.").

22.   On October 29, 2021, DHS issued a memorandum announcing its decision to terminate MPP due to "inherent problems with the program[,]" including, among other things, its imposition of "substantial and unjustifiable human costs on migrants who were exposed to harm while waiting in Mexico."  (Dkt. 279-8, Exh. 71, Explanation of the Decision to Terminate the Migrant Protection Protocols at 2-3).

23.   When the trial in this case took place, defendants had rescinded MPP but a court had stayed the rescission.  See Texas v. Biden, 646 F.Supp.3d 753, 761 (N.D. Tex. 2022), appeal dismissed, 2023 WL 5198783 (5th Cir. 2023) (staying implementation of DHS's October 29, 2021,

memorandum and corresponding decision to terminate MPP until the Northern District of Texas court resolves the merits of Plaintiffs' claims). Although individuals were no longer being enrolled in MPP, concerns remained about whether enrollments might restart as a result of litigation or executive policy. (See Dkt. 203, Menza Decl. at ¶ 34); (Dkt. 205, Tafur Decl. at ¶ 144).

24. On January 20, 2025, President Donald Trump issued an Executive Order formally restarting MPP. See Exec. Order No. 14165, Securing Our Borders, 90 Fed. Reg. 8467 (January 20, 2025).

IV. DEFENDANTS' POLICY TOWARD MPP-UNACCOMPANIED CHILDREN.

25. CBP and ICE coordinate to prosecute previously initiated § 240 removal proceedings against MPP-unaccompanied children and to enforce any removal orders issued prior to their entry as unaccompanied children. (See Dkt. 279-7, Field Office Juvenile Coordinator Handbook at AR 2312, 2370); (Dkt 268, PTO at ¶ 5.A.).

26. Under defendants' policy ("Policy"), children who re-enter the United States unaccompanied after previously being processed with a parent or legal guardian into MPP are subject to their family's previously initiated § 240 proceeding, including any pending proceeding and/or previously issued final removal order. (See Dkt 268, PTO at ¶ 5.A.).

27. On May 7, 2021, USCIS issued updated guidance to provide that affirmative asylum applications filed by MPP-unaccompanied children, regardless of the status of their MPP proceedings, should be processed in the same way as those filed by unaccompanied children not subject to MPP. (See Dkt. 268, PTO at ¶ 6.F.); (Dkt 279-7, Exh. 46, Updated Service Center Operations Guidance for Accepting Forms I-589 Filed By Applicants Who May Be Unaccompanied Alien Children ("2021 USCIS Guidance") at AR 2451).

28. Despite the USCIS guidance, defendants have put forth no policy or safeguard to ensure that MPP-unaccompanied children can have an affirmative asylum claim adjudicated prior to deportation. (See, generally, AR).

29. Between November 2019 and December 15, 2021, 1,245 children were initially encountered by CBP as part of a family unit, processed for § 240 removal proceedings, sent back to Mexico pursuant to MPP, and subsequently encountered when they attempted to re-enter the

United States unaccompanied. (See Dkt. 103-2, Defendant ICE's Amended Responses to Plaintiffs' Interrogatories Nos. 1-9 (Mar. 11, 2022) at 2-3). The number of MPP-unaccompanied children encountered by defendants has increased from the 1,245 MPP-unaccompanied children defendants encountered as of December 15, 2021. (See Dkt. 273, Sanctions Motion at 2).

30. Defendants have removed more than 25 MPP-unaccompanied children pursuant to an MPP order of removal. (See Dkt. 273, Sanctions Motion at 2).

31. More than 231 MPP-unaccompanied children have been issued a removal order pursuant to proceedings initiated when they were enrolled in MPP. (See Dkt. 273, Sanctions Motion at 2).

32. More than 193 MPP-unaccompanied children have been issued a removal order pursuant to proceedings initiated when they were enrolled in MPP but have not yet been removed. (See Dkt. 273, Sanctions Motion at 2).

33. Between December 16, 2021, and October 31, 2023, CBP encountered an additional 183 MPP-unaccompanied children and, during this same time period, removed additional MPP-unaccompanied children. (See Dkt. 281-1, Exh. A, CBP's Supplemental Response to Plaintiffs' Interrogatory No. 1 at 3); (Dkt. 281-2, Exh. B, ICE's Supplemental Responses to Plaintiffs' Interrogatories Nos. 1-5 at 5 & 9).

34. As of May 10, 2022, ICE had deported at least 26 MPP-unaccompanied children based on removal orders, including in absentia removal orders, that were issued as part of their family unit's § 240 proceeding. (See Dkt. 103-2, Defendant ICE's Amended Responses to Plaintiffs' Interrogatories Nos. 1-9 (Mar. 11, 2022) at 3-4); (Dkt. 279-8, Responses of Defendant Immigration And Customs Enforcement (ICE) to Court Ordered Questions (May 24, 2022) at 8) (confirming numbers).

35. Defendants fail to notify MPP-unaccompanied children or plaintiffs that they are still prosecuting these children based on their enrollment in MPP, or subjecting them to removal based on prior removal orders issued when the child was enrolled in MPP as part of a family unit, rather than treating them as unaccompanied minors subject to TVPRA protections. (See, e.g., Dkt. 205, Tafur Decl. at ¶¶ 9, 16-17, 46 & 48).

36.  Despite screening measures, plaintiffs are not always able to identify whether an unaccompanied child was previously enrolled in MPP and has a pending § 240 proceeding or a prior removal order.  (See Dkt. 206, Donovan-Kaloust Decl. II at ¶¶ 8 & 20-21); (Dkt. 205, Tafur Decl. at ¶¶ 115 & 143); (Dkt. 207, Korolev Decl. at ¶¶ 6, 8 &12).  DHS sometimes attempts to remove MPP-unaccompanied children based on prior removal orders within days or weeks of the child's designation as an unaccompanied child.  (See, e.g., Dkt. 205, Tafur Decl. at ¶¶ 25 & 85-86).  Due to the accelerated risk of removal imposed by the Policy, plaintiffs litigate on an emergency basis, often without access to complete information and before they can fully identify or develop the child's claim.  (See Dkt. 206, Donovan-Kaloust Decl. II at ¶ 14).  In some cases, as a result of the Policy, MPP-unaccompanied children have been removed before plaintiffs had opportunities to file motions on their behalf.  (See Dkt. 284, Tr. at 71:12-72:5).

37.  Because of the Policy, DHS has attempted to remove unaccompanied children who ultimately had meritorious claims for immigration relief.  (See, e.g., Dkt. 29-18, Flamm Decl. at ¶¶ 28-45); (Dkt. 205, Tafur Decl. at ¶¶ 62-77).

## CONCLUSIONS OF LAW

I.    SUBJECT MATTER JURISDICTION.

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.  District courts have exclusive jurisdiction over civil actions for claims against the United States.  See 28 U.S.C. § 1346.

Defendants contend that plaintiffs' claims are barred by various provisions in 8 U.S.C. § 1252.[9]  (See Dkt. 288, Defendants' Post-Trial Brief at 8 & 19) (citing 8 U.S.C. § 1252(a)(2)(B)(ii), (b)(9), (d), (f)(1), (g)).  Their contentions are unpersuasive.  As the title of § 1252 specifies, this section of the INA governs "[j]udicial review of orders of removal[.]"  See 8 U.S.C. § 1252.  But plaintiffs do not seek review of any removal orders.  (See Dkt. 268, PTO at 5).  In other words, § 1252(b)(9) does not apply because this case does not "aris[e] from" an "action taken or proceeding brought to remove an alien from the United States[.]"  8 U.S.C. § 1252(b)(9); see Dep't

---

[9]  Unless otherwise indicated, all section references are to Title 8 of the United States Code.

1  of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 19,140 S.Ct. 1891, 1907

2  (2020) ("[Section] 1252(b)(9) does not present a jurisdictional bar where those bringing suit are

3  not asking for review of an order of removal, the decision . . . to seek removal, or the process by

4  which . . . removability will be determined. . . .  And it is certainly not a bar where, as here, the

5  parties are not challenging any removal proceedings.") (internal quotation marks omitted); see also

6  E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 666 (9th Cir. 2021) ("[C]laims that are

7  independent of or collateral to the removal process are not actions taken to remove an alien from

8  the United States.") (internal quotation marks omitted).  Similarly, § 1252(a)(2)(B)(ii) and § 1252(d)

9  do not apply because the court is not reviewing a denial of discretionary relief or a "final order of

10 removal."  See 8 U.S.C. § 1252(a)(2)(B)(ii), (d); Kucana v. Holder, 558 U.S. 233, 247, 130 S.Ct.

11 827, 837 (2010) (Section 1252(a)(2)(B) "bar[s] court review of discretionary decisions only when

12 Congress itself set out the Attorney General's discretionary authority in the statute.");

13 Santos-Zacaria v. Garland, 598 U.S. 411, 419, 143 S.Ct. 1103, 1114 (2023) (noting that § 1252(d)

14 merely imposes an "exhaustion requirement" and is "a non-jurisdictional rule").  Finally, § 1252(g),

15 which limits review of cases "arising from the decision or action by the Attorney General to

16 commence proceedings, adjudicate cases, or execute removal orders[,]" 8 U.S.C. § 1252(g), does

17 not pose a bar here.[10]  See Regents, 591 U.S. at 19, 140 S.Ct. at 1907 ("We have previously

18 rejected as implausible the Government's suggestion that § 1252(g) covers all claims arising from

19 deportation proceedings or imposes a general jurisdictional limitation.") (internal quotation marks

20 omitted).

21 II.    STANDING.

22      Plaintiffs have demonstrated that they have organizational standing by establishing an

23 injury in fact, fairly traceable to defendants' Policy, that is redressable through the relief plaintiffs

24 seek.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37 (1992).

25 / / /

26

27 ────────────────────

28    [10]  Because § 1252(f)(1) limits the court's jurisdiction to enter injunctive relief in certain circumstances, the court will consider this provision in determining the appropriate remedy.

A.    <u>Injury In Fact and Causation</u>.

The court considers injury in fact and causation together.  Here, plaintiffs have demonstrated that defendants' Policy has impaired their provision of legal representation to unaccompanied children – that is, the Policy "directly affected and interfered" with their "core business activities." <u>Food & Drug Administration v. Alliance for Hippocratic Medicine</u>, 602 U.S. 367, 395, 144 S.Ct. 1540, 1564 (2024); <u>see</u>, <u>e.g.</u>, <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.").

At the outset, defendants' Policy has required plaintiffs to implement additional screening measures. <u>See</u> <u>supra</u> Findings of Fact at ¶¶ 4-6 & 36.  Plaintiffs have shown, among other things, that defendants' Policy caused ImmDef to add around five minutes of screening for each unaccompanied child, (<u>see</u> Dkt. 206, Donovan-Kaloust Decl. II at ¶ 19), and that ImmDef typically screens between 200 to 400 children each month. (<u>See</u> Dkt. 284, Tr. at 41:10-13).  Assuming ImmDef screens only 200 children each month, this is an additional 200 hours of screening each year.  Plaintiffs also demonstrated that ProBAR expends approximately five to ten additional minutes screening each unaccompanied child in ORR custody and an additional hour of training for each new advocate as a result of defendants' Policy. (<u>See</u> Dkt. 207, Korolev Decl. at ¶ 6).  Similarly, The Door has to expend additional time screening unaccompanied children due to the Policy. (<u>See</u> Dkt. 29-18, Flamm Decl. at ¶¶ 58 & 72).

Putting aside the additional screening measures plaintiffs have had to implement, plaintiffs' ability to provide legal services has been adversely affected by defendants' Policy.  For instance, the dearth of information about the procedural history of an MPP-unaccompanied child's case and the expedited timelines on which plaintiffs must litigate have impaired the quality of plaintiffs' representation. (<u>See</u> Dkt. 284, Tr. at 55:21-56:25); (Dkt. 207, Korolev Decl. at ¶ 17) (Plaintiffs "cannot provide effective legal services to children with incomplete knowledge of their immigration history.").  Plaintiffs are often forced to pursue additional litigation and advocacy – on an

emergency basis – that fall outside of the normal course of representation in an unaccompanied child's case.  (See Dkt. 205, Tafur Decl. at ¶ 143); (Dkt. 206, Donovan-Kaloust Decl. II at ¶¶ 7, 14-16 & 49); (Dkt. 203, Menza Decl. at ¶ 25); (Dkt. 207, Korolev Decl. at ¶ 25).  For example, despite plaintiffs' efforts, defendants removed at least three children before RAICES could file anything in their case.  (See Dkt. 284, Tr. at 71:12-72:5).  Plaintiffs' injuries are thus directly analogous to those suffered by the plaintiffs in Havens Realty Corp. v. Coleman.  See FDA, 602 U.S. at 395, 144 S.Ct. at 1564 ("[W]hen [defendant] Havens gave [plaintiff] HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'") (citing Havens, 455 U.S. at 379, 102 S.Ct. at 1114).[11]  In sum, plaintiffs have each demonstrated injuries-in-fact caused by defendants' Policy.  See, e.g., supra Findings of Fact at ¶¶ 16-18, 23 & 35-37.

       B.    Redressability.

Plaintiffs have also demonstrated that a favorable decision is likely to redress their injury.  See Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir. 1994) ("[T]o have standing, a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury.") (emphasis in original).  If the Policy is vacated, plaintiffs will no longer need to allocate additional time and resources to screen unaccompanied children and train their staff.  (See, e.g., Dkt. 284, Tr. at 56:7-57:5, 71:16-22) (discussing RACIES' changes due to the Policy); (Dkt. 207, Korolev Decl. at ¶¶ 6-7) (discussing ProBAR's changes); (See Dkt. 29-18, Flamm Decl. at ¶¶ 58, 71-73) (discussing The Door's changes); (Dkt. 206, Donovan-Kaloust Decl.

---

[11]  Defendants' argument that plaintiffs' injuries are not traceable because issuance of a new Notice to Appear ("NTA") would also require them to expend additional resources, (see Dkt. 288, Defendants' Post-Trial Brief at 6), misrepresents the relief plaintiffs are seeking – and have sought throughout the litigation.  (See, e.g., Dkt. 230, Plaintiffs' Amended Memorandum of Contentions of Fact and Law at 1-2) ("Plaintiffs' Memo never even mentions Notices to Appear, nor do they form the centerpiece of Plaintiffs' claims as Defendants repeatedly suggest."); (Dkt. 294, Reply in Support of Plaintiffs' Post-Trial Brief at 5) ("Plaintiffs are struggling to find a way to effectively communicate to Defendants that Plaintiffs do not seek the remedy of new NTAs.") (emphasis omitted).

II at ¶¶ 19, 41-45) (discussing ImmDef's changes).  The fundamental disruption to plaintiffs' core activities will end and plaintiffs will be able to offer unimpaired representation to all unaccompanied children, including pursuing the appropriate defensive or affirmative applications for immigration relief to which the children may be entitled.  (See, e.g., Dkt. 284, Tr. at 57:21-59:14 & 75:1-7).

III.    DEFENDANTS' POLICY VIOLATES THE APA.

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Here, the court finds that defendants' Policy violates the APA for two reasons.  First, the Policy directly conflicts with the protections enshrined in the TVPRA, and is therefore contrary to law.  Second, because defendants failed to adequately explain their decision and consider an important aspect of the problem in developing the Policy, it is arbitrary and capricious.

A.    Final Agency Action.

An agency's action must be "final" to be subject to judicial review under the APA.  See 5 U.S.C. § 704.  "[T]wo conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process, . . . [meaning] it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow[.]"  Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 1168 (1997) (internal quotation marks and citation omitted).  With a "focus on the practical and legal effects of the agency action[,]" courts consider "whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance [with the terms] is expected."  Oregon Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006) (internal quotation marks omitted).

Here, defendants stipulated to the existence of the Policy, (see Dkt. 268, PTO at ¶ 5.A.), and nothing in the record indicates that the Policy is tentative or that decisionmaking is ongoing.  (See, generally, AR).  Indeed, the record contains two documents indicative of a final decision: (1) a chart prepared by ICE that begins with "MPP UAC Encountered Alone," and instructs CBP

to process MPP-unaccompanied children consistent with the Policy, (see Dkt. 279-7, Exh. 46, Field Office Juvenile Coordinator Handbook, UAC Encounter MPP Process Flow at AR 2370); and (2) a memorandum directing the same. (See Dkt. 279-7, Exh. 46, Muster - Recordation of UACs Previously Processed Under the Migrant Protection Protocols at AR 2293). Defendants argue that in developing the Policy there was no "conscious decision-making." (See Dkt. 288, Defendants' Post-Trial Brief at 8-9). However, as the two documents indicate, when defendants began encountering MPP-unaccompanied children, they made a decision about how to process them. Indeed, it is undisputed that defendants have enforced the Policy against dozens of children. (See Dkt. 103-2, Defendant ICE's Amended Responses to Plaintiffs' Interrogatories Nos. 1-9 at 3).

Further, defendants' argument that "the Government is simply executing the law[,]" (see Dkt. 288, Defendants' Post-Trial Brief at 9), is irrelevant because the question of whether the Policy is inconsistent with the law is the subject of the instant action. That the government believes it is complying with the law is a question of the Policy's legality, not an indication of its purported lack of finality. As the cited documents indicate, defendants chose to process MPP-unaccompanied children such that they would be subject to prior proceedings and removal orders based on their previous enrollment in MPP as part of a family unit. In other words, "[t]hough the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior . . . belies the claim that its interpretation is not final." Whitman v. Am. Trucking Associations, 531 U.S. 457, 479, 121 S.Ct. 903, 915 (2001); see also F.T.C. v. Standard Oil Co. of California, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 492 n. 7 (1980) (noting the APA was passed "to assure the complete coverage of every form of agency power, proceeding, action, or inaction.") (internal quotation marks omitted). In short, to the extent the Policy results in the processing of immigration claims for MPP-unaccompanied children, the Policy constitutes an agency action "from which legal consequences will flow." Bennet, 520 U.S. at 178, 117 S.Ct. at 1168 (internal quotation marks omitted); (see, generally, Dkt. 288, Defendants' Post-Trial Brief at 9) (failing to make an argument with respect to the "legal consequences" element); (see Dkt. 279-7, Exh. 46, Field Office Juvenile Coordinator Handbook, UAC Encounter MPP Process Flow at AR 2370); (Dkt. 279-7, Exh. 46, Muster - Recordation of UACs Previously Processed Under the Migrant

1  Protection Protocols at AR 2293).  Accordingly, the Policy is final agency action subject to judicial

2  review.  See 5 U.S.C. § 704.

3         B.    Contrary to Law.

4         As noted above, arriving noncitizens are generally placed in § 240 removal proceedings

5  unless they are subject to another procedure.  See 8 U.S.C. § 1229a(a).  In these adversarial

6  proceedings, noncitizens may assert claims for immigration relief defensively, see id. at §

7  1229a(a)(1), § 1229a(c)(4); (see Dkt. 268, PTO at ¶ 6.T), and arriving noncitizens, including those

8  processed through MPP, are generally not eligible for affirmative asylum[12] or voluntary departure.[13]

9  (See Dkt. 279-5, Exh. 46, MPP Guiding Principles at AR 1) (noting those amenable to MPP will

10  be issued an NTA and placed in § 240 proceedings); 8 U.S.C. § 1229c(a)(4) (providing that

11  arriving noncitizens are not eligible for voluntary departure).

12        When a child arrives as part of a family unit, they generally do not assert their own claims

13  for immigration relief, leaving their status contingent on their parents' claims.  In other words, if the

14  family is placed in § 240 proceedings, one parent may file an asylum claim as the principal

15  applicant, and if they are granted asylum, the child will obtain status as a derivative applicant.  See

16  8 U.S.C. § 1158 (b)(3)(A) (providing for derivative asylum for asylee's spouse and unmarried

17  children.); 8 C.F.R. § 207.7 (explaining derivative status and benefits).  Thus, children processed

18  through MPP as part of a family unit were likely derivatives to one of their parents' asylum

19

20

---

21        [12] Affirmative asylum is a process through which an applicant's claim for asylum is adjudicated

22  in the first instance in a non-adversarial interview with USCIS.  See 8 C.F.R. § 208.9(b) ("The
   asylum officer shall conduct the interview in a nonadversarial manner[.]"); 8 C.F.R. § 208.2

23  (distinguishing between the jurisdiction of USCIS and immigration judges); (Dkt. 268, PTO at

24  ¶ 6.D.).

25        [13]  Voluntary departure enables eligible noncitizens to depart voluntarily either before
   immigration proceedings are initiated, see 8 U.S.C. § 1229c(a)(1), or at the conclusion of

26  immigration proceedings before a removal order is entered.  See id. at § 1229c(b)(1).  Voluntary
   departure allows noncitizens to avoid the issuance of a final removal order, which in turn avoids

27  the multi-year prohibition on reentry.  For example, a noncitizen who is removed following a § 240
   proceeding is automatically inadmissible to reenter the United States for a ten-year period.  See

28  8 U.S.C. § 1229a(b)(7); 8 U.S.C. § 1182(a)(9)(A)(ii).

applications asserted defensively in § 240 proceedings, meaning the child would only obtain relief if their parent proved their own asylum claim.

By contrast, children who arrive unaccompanied are guaranteed special protections, including the right to seek affirmative asylum in a non-adversarial setting in the first instance. Recognizing that unaccompanied children are among the "most vulnerable immigrants," Congress enacted the TVPRA to provide unaccompanied children with enhanced substantive and procedural protections. See Flores v. Sessions, 862 F.3d 863, 880 (9th Cir. 2017) ("Congress sought to improve the procedures governing the treatment of unaccompanied minors."); U.S.C. § 1232. Through the TVPRA, Congress sought to protect unaccompanied children to ensure they are treated humanely and fairly, with attention to their particular needs, as they navigate a complex immigration system without a parent or guardian. See Flores, 862 F.3d at 880. Accordingly, the TVPRA provides greater substantive and procedural safeguards than those afforded to adults and families in removal proceedings. See id.; 8 U.S.C.§ 1232(c)(5). For example, the TVPRA unambiguously guarantees the following protections to unaccompanied children: (1) that an asylum officer has initial jurisdiction over any unaccompanied child's asylum claim,[14] see 8 U.S.C. § 1158(b)(3)(C); (2) exemption from the one-year deadline to apply for asylum, see 8 U.S.C. § 1158(a)(2)(E); (3) if DHS seeks to remove an unaccompanied child, the right to "place[ment]" into § 240 proceedings before removal, see 8 U.S.C. § 1232(a)(5)(D)(i); (4) "access to counsel" "to the greatest extent practicable," see 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5); and (5) statutory eligibility to seek voluntary departure at no cost to the child.[15] See 8 U.S.C. § 1232(a)(5)(D)(ii). In keeping with its purpose, the TVPRA expressly recognizes that unaccompanied children have "specialized needs" and that "[a]pplications for asylum and other forms of relief from removal in

---

[14] Thus, while most arriving individuals, families, and accompanied children can only assert their asylum claims defensively in § 240 proceedings, the TVPRA guarantees unaccompanied children the right to seek asylum affirmatively in a non-adversarial proceeding, even if they are placed in § 240 proceedings.

[15] The TVPRA provides additional protections not discussed here, such as provisions concerning the care and custody of children to ensure safe placements. See, e.g., 8 U.S.C. § 1232(c).

which an unaccompanied alien child is the principal applicant shall be governed by regulations which take into account the specialized needs of unaccompanied alien children and which address both procedural and substantive aspects of handling unaccompanied alien children's cases."[16] 8 U.S.C. § 1232 (d)(8).  Defendants' Policy, however, subjects MPP-unaccompanied children to their family's previously initiated § 240 proceedings, including any pending proceedings or prior removal order, thereby preventing these children from accessing the full scope of protections afforded to them by law – that is, both their TVPRA rights and the potential immigration relief itself.

It is worth reiterating that MPP is an executive policy, and defendants' Policy is an agency policy whereas the TVPRA is a federal statute which, needless to say, takes precedence if there is any conflict or practical problems resulting from MPP or the Policy.  To the extent the government finds itself confronting any procedural oddities in processing arriving, unaccompanied children whom it had previously sent to Mexico to wait for their immigration hearing, this appears to be a result of its own policy choices.

Nevertheless, throughout the case, the government has repeatedly suggested that a ruling in plaintiffs' favor would somehow incentivize children to separate from their families and attempt to enter the United States.  (See, e.g., Dkt. 284, Tr. at 164:18-24 & 174:10-16).  As noted earlier, MPP-unaccompanied children, like all unaccompanied children, have often experienced

---

[16] Because of their developmental needs, dependence, vulnerability to harm, and exposure to trauma and various forms of violence and precarity, unaccompanied children have different needs than adults or children with parents or guardians. (See, e.g., Dkt. 279-7, Exh. 46, Juvenile and Family Residential Management Unit Field Office Juvenile Coordinator Handbook: Enforcement and Removal Operations ("Field Office Juvenile Coordinator Handbook") at AR 2294, 2307-13) (describing "policy and practices related to the needs of Unaccompanied Alien Children"); (Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701-02) (noting that many unaccompanied children have experienced trauma, violence, and family separation); see also 8 U.S.C. § 1232(d)(8) (noting unaccompanied children have "specialized needs").  For instance, when legal service providers work with an unaccompanied child to investigate and develop the child's potential claims for immigration relief, the child's developmental stage can impede the child's ability to understand and form a narrative of his or her experiences in their country of origin, and the child's exposure to trauma can make it difficult to build the trust and rapport necessary for the child to disclose key information.  (See Dkt. 284, Tr. at 42:18-43:12, 82:5-83:19); (Dkt. 279-4, Exh. 34, Expert Report of Dr. Minal Giri at ¶¶ 38-39, 43-44 & 47-48); (Dkt. 205, Tafur Decl. at ¶ 14 & 53); (Dkt. 29-20, Donovan-Kaloust Decl. I at ¶¶ 16 & 18); (Dkt. 207, Korolev Decl. at ¶ 24).

immeasurable trauma, including the death of their parents or family members or forcible, unforseen separation from the family members with whom they initially attempted to enter into the United States.  (See, e.g., Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701-02) (noting that many unaccompanied children have experienced trauma, violence, and family separation).  Thus, the government's suggestion reflects not only a fundamental misunderstanding of the circumstances that typically lead MPP-unaccompanied children to arrive at the border, but it also overlooks the mandatory nature of the TVPRA, which guarantees certain protections for unaccompanied children – irrespective of the specific circumstances that led an unaccompanied child to arrive at the border, and irrespective of defendants' concerns about "incentives."

Defendants' Policy violates the TVPRA in numerous respects.  First, because the Policy relies on prior § 240 proceedings for MPP-unaccompanied children, it contravenes the TVPRA's requirement that "[a]ny unaccompanied alien child sought to be removed . . . shall be . . . placed in removal proceedings under section 240."  8 U.S.C. § 1232(a)(5)(D)(i).  In other words, § 1232(a)(5)(D)(i) entitles "[a]ny unaccompanied alien child" to placement in § 240 proceedings as an unaccompanied child with the full range of protections to which unaccompanied children are entitled, including "access to counsel" "to the greatest extent practicable."  8 U.S.C. § 1232(a)(5)(D)(i), (a)(5)(D)(iii), (c)(5). Defendants' argument that MPP-unaccompanied children's prior placement in removal proceedings as part of a family unit satisfies this requirement retroactively, (see Dkt. 288, Defendants' Post-Trial Brief at 10-12), is unpersuasive, because the children were not "unaccompanied" at the time of their initial placement in such proceedings. Section 1232(a)(5)(D)(i)'s use of the prospective "shall be . . . placed" reinforces the court's conclusion that a past proceeding will not suffice. See United States v. Wilson, 503 U.S. 329, 333, 112 S.Ct. 1351, 1354 (1992) ("Congress' use of a verb tense is significant in construing statutes.").  Courts have recognized that where children had a prior proceeding or removal order, the TVPRA requires additional process once the child becomes unaccompanied.  For instance, in Velasquez-Castillo v. Garland, 91 F.4th 358 (5th Cir. 2024), the Fifth Circuit suggested that an MPP-unaccompanied child with a prior removal order might still be entitled to placement in § 240

proceedings and noted that application of the TVPRA would potentially void the child's prior removal order.  Id. at 362 ("Velasquez-Castillo met the requirements of the TVPRA when he filed his subsequent asylum claim, which is still pending.  Application of the TVPRA to this case would invalidate the existing removal order and provide an alternative pathway for Velasquez-Castillo to pursue his asylum claim.") (citing 8 U.S.C. § 1232(a)(5)(D)).

Nor are defendants correct that construing the statute to require the placement of MPP-unaccompanied children in § 240 proceedings in accordance with § 1232(a)(5)(D)(i)'s protections for unaccompanied children would create tension with 8 U.S.C. § 1229a(a)(3)'s provision for "a proceeding" rather than multiple proceedings.  (See Dkt. 288, Defendants' Post-Trial Brief at 10-12).  Section 1229a(a)(3) states in relevant part that, "[u]nless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States[.]"  8 U.S.C. § 1229a(a)(3).  Section 1232(a)(5)(D)(i), which is located elsewhere "in this chapter," specifies otherwise because it provides for an unaccompanied child's placement in § 240 proceedings, without exception.[17]  See 8 U.S.C. § 1232(a)(5)(D)(i).  Further, even if the court were to find that the two provisions conflict – and, to be clear, they do not – it would nevertheless conclude that § 1232(a)(5)(D)(i)'s provisions

---

[17]  It is possible for noncitizens to have more than one § 240 proceeding.  For example, noncitizens may seek admission more than once, see, e.g., 8 U.S.C. § 1229a (b)(7); 8 U.S.C. § 1182(a)(9)(A)(ii) (establishing a ten-year bar on reentry following a final removal order), and unaccompanied children who were previously removed and subsequently reenter unaccompanied would be placed in § 240 proceedings a second time.  This is because unaccompanied children are not subject to expedited removal or reinstatement of removal.  (See Dkt. 279-7, Exh. 46, Field Office Juvenile Coordinator Handbook at AR 23101) ("All UAC whom DHS seeks to remove from the United States should be placed in removal proceedings under § 240 of the Immigration and Nationality Act (INA).  TVPRA prohibits ERO from granting Voluntary Return, effecting Expedited Removal, or reinstating the prior removal order of any UAC.").  Thus, an unaccompanied child who had prior § 240 proceedings, was issued a removal order, and was removed would still be placed in § 240 proceedings.  (See id.).  Notably, the government has previously taken the position that unaccompanied children are not subject to expedited removal because the TVPRA requires placement in § 240 proceedings.  (See Brief for Appellants in Flores v. Lynch, 9th Cir. Case No. 15-56434, 2016 WL 330944, *18 (Jan.15, 2016)) (government's brief citing the TVPRA for the proposition that "[t]he detention requirements of the INA governing expedited removal and reinstatement of removal . . . do not, however, apply to [UC], since they cannot be subjected to expedited removal or reinstatement").

for unaccompanied children trump whatever limitations § 1229a(a)(3) might impose.  See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645, 132 S.Ct. 2065, 2071 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general. . . .  That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.") (internal quotation marks and citations omitted).

Second, § 1158(b)(3)(C) provides that "[a]n asylum officer . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child[.]"[18]  8 U.S.C. § 1158(b)(3)(C). Because plaintiffs have shown that the Policy prevents MPP-unaccompanied children from availing themselves of their right to proceed before an asylum officer rather than an immigration judge, (see, e.g., Dkt. 284, Tr. at 71:16-22) ("I can think of . . . three cases where the children were removed from ORR before we had an opportunity to file anything in their case."); (Dkt. 284, Tr. at 149:24-150:2), it is contrary to law.[19]  Cf. J.O.P. v. U.S. Dep't of Homeland Sec., 338 F.R.D. 33, 62 (D. Md. 2020) ("This Court agrees and finds that it would be manifestly unjust to require Plaintiffs and proposed class members to defend their asylum application in an adversarial setting – rather than the non-adversarial forum that the TVPRA promises them[.]").  Under the Policy, defendants seek to prosecute prior § 240 proceedings or remove MPP-unaccompanied children before their affirmative asylum claims are adjudicated, (see Dkt. 284, Tr. at 149:24-150:2), or even before they have the opportunity to apply, rendering their right to apply for affirmative asylum

---

[18]  As the government recognizes, this includes initial jurisdiction over asylum applications filed by unaccompanied children in pending removal proceedings or with a prior removal order.  (See Dkt 279-7, Exh. 46, 2021 USCIS Guidance at AR 2451) ("[T]he NSC should accept the asylum application of an individual in removal proceedings or with a final removal order whose asylum application has not already been adjudicated by USCIS if any of the following three conditions are met[.]").

[19]  As noted earlier, a pending or prior § 240 proceeding that began when the child was enrolled in MPP likely involves an asylum application in which the child is merely a derivative – that is, the pending or prior case likely concerns their parent's application for relief, not their own application. But the TVPRA envisions that unaccompanied children should have the opportunity to apply for affirmative asylum as the principal applicant, likely with the help of counsel.  See 8 U.S.C. § 1158(b)(3)(C); 8 U.S.C. § 1232(c)(5).

essentially meaningless.  (See also Dkt. 284, Tr. at 224:4-7) ("[W]hat good is it to be able to file an affirmative asylum application as an MPP-unaccompanied kid, if you can be literally deported before it's adjudicated."); cf. E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 772 (9th Cir. 2018) ("[T]o say that one may apply for something that one has no right to receive is to render the right to apply a dead letter.") (internal quotation marks omitted).

Third, the TVPRA guarantees that "[a]ny unaccompanied alien child sought to be removed . . . shall be . . . eligible for relief under . . . 8 U.S.C. [§] 1229c" – that is, voluntary departure – "at no cost to the child[.]"  8 U.S.C. § 1232(a)(5)(D)(ii).  Defendants concede that at least some MPP-unaccompanied children are ineligible for voluntary departure, (see Dkt. 284, Tr. at 34:3-14), but argue that, "[b]eyond creating a 'cost-free' requirement for unaccompanied children, Section 1232(a)(5)(D)(ii) does not otherwise expand or change access to, or eligibility for, voluntary departure." (Dkt. 288, Defendants' Post-Trial Brief at 15).  But the TVPRA provides that unaccompanied children are eligible for voluntary departure, while defendants' Policy is that MPP-unaccompanied children with a prior final removal order are ineligible – this is a direct conflict between the Policy and the statute.  The language of § 1232(a)(5)(D)(ii) is clear that "[a]ny unaccompanied alien child" – meaning all unaccompanied children – must be eligible for voluntary departure.  See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012) ("Words are to be given the meaning that proper grammar and usage would assign them[.]"); see also United States v. Great N. Ry. Co., 343 U.S. 562, 575, 72 S.Ct. 985, 993 (1952) ("It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written."); Lamie v. U.S. Trustee, 540 U.S. 526, 538, 124 S.Ct. 1023, 1032 (2004) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.").  Because the Policy denies MPP-unaccompanied children such eligibility, it is contrary to law.

In short, the TVPRA provides unaccompanied children with certain legal protections which defendants' Policy ignores, in violation of the law.  Specifically, requiring MPP-unaccompanied children to be subject to a removal order or a proceeding initiated before they became unaccompanied children, without access to the substantive protections provided by the TVPRA,

runs counter to both the text and intent of the statute.  See Flores, 862 F.3d at 880 ("The overarching purpose of the . . . TVPRA was quite clearly to give unaccompanied minors more protection, not less."); see also RadLAX Gateway Hotel, 566 U.S. at 645, 132 S.Ct. at 2071 ("[T]he specific governs the general."); Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143, 120 S.Ct. 1291, 1306 (2000) (Where a subsequent statute is more specific than a prior one, the "specific policy embodied in a later federal statute should control our construction of the [earlier] statute.").

C.    Arbitrary and Capricious.

Agency action is arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867 (1983).  Here, defendants failed to "articulate a satisfactory explanation for [their] action" and "consider an important aspect of the problem."  Id.

First, defendants articulated no basis for the decision to subject MPP-unaccompanied children to the Policy.  (See, generally, AR).  The requirement of a reasoned explanation "is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned.  But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221, 136 S.Ct. 2117, 2125 (2016) (internal citation and quotation marks omitted).  The government acknowledged repeatedly that USCIS has initial jurisdiction over affirmative asylum claims filed by unaccompanied children, (see e.g., Dkt. 284, Tr. at 147); indeed, the government's Field Office Juvenile Coordinator Handbook indicates that when the government encounters unaccompanied children who were previously removed pursuant to a removal order, it places them in § 240 proceedings in an attempt to comply with the TVPRA, irrespective of the prior removal order.  (See Dkt. 279-7, Exh. 46, Field Office Juvenile Coordinator Handbook at AR 23101) ("All UAC whom DHS seeks to remove from the United States should be placed in removal

proceedings under § 240 of the Immigration and Nationality Act (INA).  TVPRA prohibits ERO from granting Voluntary Return, effecting Expedited Removal, or reinstating the prior removal order of any UAC.").  Despite this, when the government encounters an MPP-unaccompanied child who was previously sent to Mexico, it either reinstates the prior § 240 proceeding or seeks to enforce a prior removal order, rather than placing the unaccompanied child in a § 240 proceeding.  The record, however, contains no explanation for the government's inconsistent position, let alone an explanation for the Policy.  The absence of a reasoned explanation thus renders the Policy arbitrary and capricious.

Second, even if there were some statutory ambiguity as to how defendants should process MPP-unaccompanied children, defendants failed to consider important aspects of the problem.  As noted earlier, and as the government acknowledges, (see, e.g., Dkt. 279-7, Exh. 46, Field Office Juvenile Coordinator Handbook at AR 2294, 2307-13) (describing "policy and practices related to the needs of Unaccompanied Alien Children"), unaccompanied children have unique needs and safety concerns, which the TVPRA recognizes by providing these children with special procedures and rights in our country's complex immigration system.    See 8 U.S.C. § 1232(a)(5)(D), (d)(8); (see also Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701-02) (noting that many unaccompanied children have experienced trauma, violence, and family separation).  But the record contains no evidence, (see, generally, AR), that defendants, in determining how to process MPP-unaccompanied children, considered the children's specialized needs and unique vulnerabilities – considerations clearly identified by the TVPRA.  See 8 U.S.C. § 1232(d)(8) (noting that unaccompanied minors have "specialized needs"); WildEarth Guardians v. Bucknall, 2024 WL 4711128, *7 (D. Mont. 2024) ("Whether an agency has overlooked 'an important aspect of the problem' ... turns on what [the] relevant substantive statute makes 'important.'") (quoting Or. Natural Res. Council v. Thomas, 92 F.3d 792, 798 (9th Cir. 1996)); (see also Dkt. 279-5, Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions at AR 701) (noting that unaccompanied children have often experienced various forms of trauma and that an estimated "40 percent of unaccompanied children are potentially eligible for relief").

1   Because defendants did not consider critical aspects of the problem in developing the Policy, it

2   is arbitrary and capricious.

3   IV.    THE POLICY VIOLATES PROCEDURAL DUE PROCESS.

4          The government violates the Due Process Clause of the Fifth Amendment when it denies

5   a constitutionally protected liberty or property interest through a process that lacks adequate

6   safeguards, as evaluated by "consideration of three distinct factors: First, the private interest that

7   will be affected by the official action; second, the risk of an erroneous deprivation of such interest

8   through the procedures used, and the probable value, if any, of additional or substitute procedural

9   safeguards; and finally, the Government's interest, including the function involved and the fiscal

10  and administrative burdens that the additional or substitute procedural requirement would entail."

11  Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903 (1976); see, e.g., Flores-Chavez v.

12  Ashcroft, 362 F.3d 1150, 1160-61 (9th Cir. 2004) (applying Mathews test to due process claim of

13  immigrant child in removal proceedings).

14         Here, even if the Policy did not violate the APA, it would run afoul of the Due Process

15  Clause.  As discussed above, see supra at § III., MPP-unaccompanied children are statutorily

16  entitled to apply for affirmative asylum before an asylum officer in the first instance, see 8 U.S.C.

17  § 1158(b)(3)(C), and to seek voluntary departure before a removal order is issued.  See 8 U.S.C.

18  § 1232(a)(5)(D)(ii).  These statutory entitlements are constitutionally protected property interests.

19   See, e.g., Orantes-Hernandez v. Meese, 685 F.Supp. 1488, 1504-05 (C.D. Cal. 1988), aff'd sub

20  nom., Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir. 1990) (finding a "constitutional

21  right to due process and statutory right to apply for political asylum and withholding of

22  deportation"); United States v. Melendez-Castro, 671 F.3d 950, 954 (9th Cir. 2012) (finding the

23  right to receive information regarding voluntary departure to be a constitutionally protected interest

24  and the deprivation of a genuine opportunity to apply to be due process violation); see also The

25  Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972)

26  ("Property interests, of course, are not created by the Constitution.  Rather they are created and

27  their dimensions are defined by existing rules or understandings that stem from an independent

28

1   source[.]").[20]   Defendants deny these property interests to MPP-unaccompanied children by

2   deporting them before they have an opportunity to seek affirmative asylum and by denying them

3   the opportunity to seek voluntary departure.  See supra at § III.

4        Under the Mathews test, defendants' existing procedures are constitutionally deficient.  See

5   424 U.S. at 335, 96 S.Ct. at 903.  First, the right to apply for affirmative asylum and the right to

6   seek voluntary departure both involve weighty private interests, for the "potential injury[,]" id. at

7   340, 96 S.Ct. at 905, includes deportation, which "visits a great hardship on the individual and

8   deprives him of the right to stay and live and work in this land of freedom." Bridges v. Wixon, 326

9   U.S. 135, 154, 65 S.Ct. 1443, 1452 (1945).  Second, defendants' procedures create a tremendous

10  "risk of an erroneous deprivation[,]" Mathews, 424 U.S. at 335, 96 S.Ct. at 903 – plaintiffs have

11  demonstrated that the existing safeguards are inadequate to ensure that MPP-unaccompanied

12  children are able to apply for affirmative asylum or be placed in § 240 proceedings and seek

13  voluntary departure prior to removal.  See supra at § III.  Finally, there is no evidence that

14  additional safeguards like adequate and timely notice of an unaccompanied child's MPP status

15  would burden defendants.  (See, generally, Dkt. 288, Defendants' Post-Trial Brief at 17-20).  In

16  short, plaintiffs have demonstrated that defendants' Policy violates the Due Process Clause.

## CONCLUSION

17

18  Based on the foregoing, IT IS ORDERED THAT:

19      1. Plaintiffs' Sanctions Motion **(Document No. 273)** is **granted** as set forth herein.

20      2. Judgment shall be entered in plaintiffs' favor after the remedies have been resolved.

21

22

_____

23  [20] Defendants' citations to Munoz v. Ashcroft, 339 F.3d 950 (9th Cir. 2003), and Cruz-Orellana
    v. Sessions, 878 F.3d 1 (1st Cir. 2017), (see Dkt. 288, Defendants' Post-Trial Brief at 19), do not
24  compel a different conclusion.  Both cases held that a noncitizen did not have a constitutional right
    to prevail when seeking discretionary relief, see Munoz, 339 F.3d at 954 ("Since discretionary
25  relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest
    protected by the Due Process clause."); Cruz-Orellana, 878 F.3d at 4 (no property interest in
26  prevailing on a voluntary departure claim), but neither considered whether the right to apply for
    discretionary relief may constitute a property interest. See also Melendez-Castro, 671 F.3d at 954
27  (finding that the right to receive information regarding voluntary departure is a constitutionally
28  protected interest).

3.  No later than **March 31, 2025**, plaintiffs shall file their opening brief with respect to remedies.

4.  Defendants shall file their opposing brief no later than **April 14, 2025**.

5.  Plaintiffs shall file their reply no later than **April 24, 2025**.

6.  Plaintiffs' opening brief and defendants' opposition brief shall not exceed 15 pages. Plaintiffs' reply brief shall not exceed ten pages.

Dated this 14th day of March, 2025.

                                          /s/
                                  Fernando M. Olguin
                              United States District Judge