

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IMMIGRANT DEFENDERS LAW CENTER, et al., | ) ) Case No. CV 21-0395 FMO (RAOx) ) |
| Plaintiffs, | ) ) ) |
| v. | ) **ORDER RE: REMEDIES** ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) |
| Defendants. | ) ) ) |

**<u>BACKGROUND</u>**

This is an action challenging certain policies and conduct of the U.S. Department of Homeland Security ("DHS"), the Secretary of Homeland Security, U.S. Customs and Border Protection ("CBP"), the CBP Commissioner, U.S. Immigration and Customs Enforcement ("ICE"), the Director of ICE, U.S. Enforcement and Removal Operations ("ERO"), and the Acting Executive Associate Director of ERO, (collectively, "defendants" or "the government"), regarding unaccompanied noncitizen children who previously entered the United States with their families, were placed in removal proceedings with their families, were sent to Mexico to await their proceedings pursuant to the Migrant Protection Protocols ("MPP") policy, and later returned to the United States without a parent or guardian – as unaccompanied children (hereinafter, "MPP-unaccompanied children"). (See Dkt. 14, Amended Complaint for Declaratory and Injunctive Relief ("FAC") at ¶¶ 43-56).

The Immigrant Defenders Law Center ("ImmDef"), the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), the South Texas Pro Bono Asylum Representation Project ("ProBar"), and The Door (collectively, "plaintiffs"), (see Dkt. 14, FAC at ¶¶ 17-42), filed this action seeking "to ensure that unaccompanied immigrant children" receive the "protections enshrined by the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), [and] the Due Process Clause of the Fifth Amendment to the United States Constitution[.]"  (Id. at ¶¶ 1 & 13); (see Dkt. 268, Pretrial Conference Order at 5).  Plaintiffs are legal services providers asserting claims for violations of:  (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, (see Dkt. 14, FAC at ¶¶ 234-264); and (2) the Due Process Clause.  (See id. at ¶¶ 226-233); (Dkt. 268, Pretrial Conference Order at 5).

The court held a bench trial and concluded that the government violated the APA and Due Process Clause.  (See Dkt. 304, Findings of Fact and Conclusions of Law ("Liability Order") at 26-27, 30).  In its Liability Order, the court determined that the government's policy ("Policy") of subjecting MPP-unaccompanied children to their family's previously initiated Immigration and Nationality Act ("INA") § 240 proceeding,[1] including any pending proceeding and/or previously issued final removal order, violates:  (1) the APA because it contravenes the TVPRA and is arbitrary and capricious; and (2) the Due Process Clause because it deprives MPP-unaccompanied children of their property interest in TVPRA protections by seeking to deport or deporting them before they have an opportunity to seek affirmative asylum.  (See id. at 23, 26-27, 29-30).  In this Order ("Remedies Order"), the court considers the appropriate remedy for these violations.[2]

/ / /

---

[1]  INA § 240 is codified at 8 U.S.C. § 1229a(a), and removal proceedings under this provision are known as "§ 240 proceedings."  With the exception of references to INA § 240, all section references are to Title 8 of the United States Code.

[2]  The court hereby reincorporates the findings and conclusions in its Liability Order.  (See Dkt. 304, Liability Order).  Together, the prior Liability Order and this Order comprise the court's complete findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).

**LEGAL STANDARD**

The APA provides, in relevant part, that "the reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege or immunity[.]"  5 U.S.C. § 706(2).  The Supreme Court has "long applied a strong presumption favoring judicial review of administrative action." Mach Mining, LLC v. E.E.O.C., 575 U.S. 480, 489, 135 S.Ct. 1645, 1653 (2015); see also Sackett v. E.P.A., 566 U.S. 120, 128, 132 S.Ct. 1367, 1373 (2012) ("The APA . . . creates a presumption favoring judicial review of administrative action[.]") (internal quotation marks omitted).  When a court determines that agency action is unlawful, vacatur of the action is the "presumptive remedy under the APA."[3]  350 Montana v. Haaland, 50 F.4th 1254, 1273 (9th Cir. 2022); see E. Bay Sanctuary Covenant v. Biden (E. Bay I), 993 F.3d 640, 681 (9th Cir. 2021) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed.").

In addition, "[d]istrict courts have considerable discretion in crafting suitable equitable relief." E. Bay I, 993 F.3d at 680 (internal quotation marks omitted); see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 936 (9th Cir. 2008) ("The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong[.]").  "Though the Supreme Court's recent Trump v. CASA, Inc. decision explicitly declined to extend its holding to the APA context, its complete-relief principle for crafting injunctive relief provides some useful guidance[.]" Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972, 995 (9th Cir. 2025) (internal citation omitted).[4]  Under the Court's complete-relief principle, "the question . . . is whether an injunction will offer complete relief *to the plaintiffs before the court*." CASA, 145 S.Ct. at 2557.  "[O]ne

---

[3]  The APA's presumptive remedy of vacatur remains unaffected by the Supreme Court's recent decision in Trump v. CASA, Inc., 145 S.Ct. 2540 (2025).  See id. at 2554 n. 10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

[4]  While Immigrant Defs. L. Ctr. v. Noem, 145 F.4th 972 (9th Cir. 2025) concerned preliminary injunctive relief, similar considerations likely inform permanent injunctive relief.

1  limitation on the district court's discretion to order injunctive relief is that, under the Judiciary Act

2  of 1789, district courts likely lack authority to issue 'universal injunctions' – orders that 'prohibit

3  enforcement of a law or policy against *anyone*' – to the extent '*broader* than necessary to provide

4  complete relief to each plaintiff.'"  Vasquez Perdomo v. Noem, 2025 WL 2181709, *20 (9th Cir.

5  2025) (quoting CASA, 145 S.Ct. at 2548, 2562-63).  Accordingly, courts crafting injunctive relief

6  should ensure that the remedy is "narrowly tailored to remedy the specific harm shown," E. Bay

7  I, 993 F.3d at 680, such that it is not "broader than necessary to provide complete relief to each

8  plaintiff with standing to sue."  CASA, 145 S.Ct. at 2562-63; see California v. Azar, 911 F.3d 558,

9  584 (9th Cir. 2018) ("The scope of the remedy must be no broader and no narrower than

10  necessary to redress the injury[.]"); Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558

11  (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to

12  provide complete relief to the plaintiffs.").  However, there may be "injuries for which it is all but

13  impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs."  CASA,

14  145 S.Ct. at 2557 n. 12.  That is, there may be situations in which plaintiffs are entitled to complete

15  relief and the only way to provide such relief is to enter an injunction that has the effect of

16  incidentally benefitting nonparties.  See id.; see also id. at 2558 ("In short, [t]he essence of equity

17  jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the

18  necessities of the particular case.") (internal quotation marks omitted); Fed. R. Civ. P. 54(c)

19  ("[F]inal judgment should grant the relief to which each party is entitled[.]").

20        Because APA cases challenge unlawful agency action – which may itself be wide-ranging

21  – the scope of the appropriate remedy in this context may necessarily be broad in order to afford

22  complete relief.  See E. Bay I, 993 F.3d at 681 ("Because of the broad equitable relief available

23  in APA challenges, a successful APA claim by a single individual can affect an entire regulatory

24  program.") (internal quotation marks omitted); Texas v. United States, 40 F.4th 205, 229 n. 18 (5th

25  Cir. 2022) ("In the context of immigration law, broad relief is appropriate to ensure uniformity and

26  consistency in enforcement."); see, e.g., Washington v. Trump, 145 F.4th 1013, 1038-39 (9th Cir.

27  2025) (affirming the district court's grant of a preliminary injunction and "its determination that a

28

1  universal preliminary injunction is necessary to give the States complete relief on their claims"

2  where it would be otherwise "impossible to avoid" certain harms to the plaintiff states).

3  **DISCUSSION**

4        Plaintiffs seek vacatur of the Policy, declaratory relief affirming MPP-unaccompanied

5  children's right to certain statutory protections under the TVPRA, and injunctive relief safeguarding

6  those rights.  (See Dkt. 307, Plaintiff's Post-Trial Remedies Brief at 4-8).  The court first addresses

7  the justiciability questions raised by the government – whether plaintiffs have standing to seek

8  prospective relief and whether judicial review is barred by various provisions in 8 U.S.C. § 1252.

9  (See Dkt. 309, Memorandum of Points and Authorities in Opposition ("Opp.") at 1-7).  The court

10  concludes, as it did before, that it has jurisdiction over plaintiffs' claims.  Next, the court grants

11  plaintiffs' Motion to Strike the government's post-trial evidence.  Finally, the court considers the

12  remedies plaintiffs seek in this action.

13  I.      THRESHOLD CONSIDERATIONS.

14        A.      <u>Article III Standing for Prospective Relief</u>.

15        The court previously concluded that plaintiffs have standing to pursue their claims.  (See

16  Dkt. 304, Liability Order at 16-17).  The court found that "defendants' Policy has impaired their

17  provision of legal representation to unaccompanied children – that is, the Policy 'directly affected

18  and interfered' with their 'core business activities.'"  (Id. at 16).  The government nevertheless

19  argues that plaintiffs lack standing to seek prospective relief, including declaratory and injunctive

20  relief.  (See Dkt. 309, Opp. at 6-7).

21        "[A] plaintiff seeking prospective injunctive relief . . . must demonstrate that he has suffered

22  or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood

23  that he will again be wronged in a similar way.'"  <u>Bates v. United Parcel Serv., Inc.</u>, 511 F.3d 974,

24  985 (9th Cir. 2007) (internal citations omitted).  "[P]ast injury does not provide standing to seek

25  prospective injunctive relief '[a]bsent a sufficient likelihood that [the plaintiff] will again be wronged

26  in a similar way[.]'"  <u>Gonzalez v. U.S. Immigr. & Customs Enf't</u>, 975 F.3d 788, 803 (9th Cir. 2020)

27  (quoting <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670 (1983)).

28

1      Here, plaintiffs suffered an irreparable injury and have demonstrated a "real or immediate

2  threat that [they] will be wronged again."  See Lyons, 461 U.S. at 111, 103 S.Ct. at 1670.

3  Plaintiffs' ability to represent prospective and current clients – that is, MPP-unaccompanied

4  children – has been adversely impacted, and plaintiffs have demonstrated past, ongoing, and

5  impending harms.  (See Dkt. 304, Liability Order at 16-17).  Their injuries are grounded in the

6  Policy, which continues to impair plaintiffs' provision of legal services.  (See id.).  Indeed, since

7  the bench trial, the "number of MPP-unaccompanied children . . . has increased from the 1,245

8  MPP-unaccompanied children defendants encountered as of December 15, 2021," and the

9  likelihood of future harm has only multiplied given that MPP has been reinstated.[5]  (See id. at 12-

10  13).  It is thus clear that plaintiffs' injuries are ongoing and likely to continue such that prospective

11  relief is warranted.  In short, there is nothing speculative about plaintiffs' claims, and the court finds

12  that plaintiffs have standing to seek prospective relief.  See, e.g., Rodriguez v. Bostock, 349

13  F.R.D. 333, 352 (W.D. Wash. 2025) (concluding that plaintiff facing "ongoing and prospective"

14  injuries "when he commenced suit" had standing to seek both injunctive and declaratory relief).

15      B.    Statutory Jurisdiction.

16      The court next considers the government's arguments regarding the jurisdictional bars in

17  8 U.S.C. §§ 1252(g), (b)(9), and (f)(1).  (See Dkt. 309, Opp. at 1-6).

18      As a general matter, § 1252 governs "[j]udicial review of orders of removal."  See 8 U.S.C.

19  § 1252.  Here, plaintiffs do not seek review of any removal orders; rather, they seek review of

20  government action under the APA and Due Process Clause.  (See Dkt. 307, Plaintiffs Post-Trial

21  Remedies Brief at 4-8) (detailing requests for vacatur, declaratory, and injunctive relief); (Dkt. 268,

22  Pretrial Conference Order at ¶¶ 7-8).  When a statute does not address "the type of grievance

23  which the plaintiff seeks to assert, then the statute cannot prevent an APA suit."

24

25

26       [5] The reinstatement of MPP is partly stayed pending appeal, but it remains in effect as to non-
ImmDef clients.  See Immigrant Defs. L. Ctr. v. Noem ("ImmDef II"), 145 F.4th 972, 996 (9th Cir.

27  2025) ("[N]o current or future clients of ImmDef shall be enrolled in MPP during the pendency of
this appeal.").  Moreover, the MPP litigation makes clear that the government intends to continue

28  to implement MPP, and that plaintiffs' injuries will remain ongoing and likely to recur.

1  Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 216, 132

2  S.Ct. 2199, 2205 (2012) (internal quotation marks omitted).

3       Two of the provisions invoked by the government, § 1252(g) and (b)(9), bar judicial review

4  of certain kinds of claims, not relief.  See 8 U.S.C. § 1252(g), (b)(9).  The court previously

5  determined that it has jurisdiction to consider plaintiffs' claims, notwithstanding these two

6  provisions.  (See Dkt. 304, Liability Order at 14-15); (Dkt. 45, Order on Motion to Dismiss at 11-

7  16).  Nevertheless, the court will again consider whether these two provisions bar plaintiffs' claims

8  or requested relief.

9       As for § 1252(f)(1), which limits certain kinds of injunctive relief, the court briefly addresses

10  this provision to note that it does not bar plaintiffs' requests for vacatur or declaratory relief.  See

11  infra at § I.B.3.  Because § 1252(f)(1) is a limit on the scope of injunctive relief rather than a

12  threshold jurisdictional bar, see Biden v. Texas, 597 U.S. 785, 798, 142 S.Ct. 2528, 2539 (2022)

13  ("Section 1252(f)(1) deprives courts of the power to issue a specific category of remedies: those

14  that 'enjoin or restrain the operation of' the relevant sections of the statute. . . .  And Congress

15  included that language in a provision whose title – 'Limit on injunctive relief' – makes clear the

16  narrowness of its scope."), the court considers this provision in greater depth when analyzing the

17  appropriate scope of injunctive relief.  See infra at § II.C.2.

18       1.  **Section 1252(g)**.

19       The government argues, (see Dkt. 309, Opp. at 4), that plaintiffs' requested relief is barred

20  by § 1252(g), which provides in relevant part that "no court shall have jurisdiction to hear any

21  cause or claim by or on behalf of any alien arising from the decision or action by the Attorney

22  General to commence proceedings, adjudicate cases, or execute removal orders against any alien

23  under this chapter."  8 U.S.C. § 1252(g).

24       Section 1252(g) seeks to limit "judicial constraints upon prosecutorial discretion" and thus

25  "applies to only a limited subset of deportation claims."  Reno v. Am.-Arab Anti-Discrimination

26  Comm., 525 U.S. 471, 485 n. 9, 487, 119 S.Ct. 936, 944 n. 9, 945 (1999); see Ibarra-Perez v.

27  United States, 2025 WL 2461663, *6 (9th Cir. 2025) ("The Court has characterized § 1252(g) as

28  a 'discretion-protecting provision.'").  "The provision applies only to three discrete actions that the

Attorney General may take: her decision or action to *commence* proceedings, *adjudicate* cases, or *execute* removal orders." Id. at 482, 119 S.Ct. at 943 (internal quotation marks omitted). The Supreme Court has "not interpret[ed] this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General[,]" and instead "read[s] the language to refer to just those three specific actions themselves." Jennings v. Rodriguez, 583 U.S. 281, 294, 138 S.Ct. 830, 841 (2018). Accordingly, "[s]ection 1252(g) does not divest courts of jurisdiction over cases that do not address prosecutorial discretion and address a purely legal question, which does not challenge the Attorney General's discretionary authority." Doe v. Noem, 781 F.Supp.3d 1055, 1068 (E.D. Cal. 2025) (internal quotation marks omitted).

The Ninth Circuit has emphasized that § 1252(g) does not apply to claims that "do not arise from a decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien, but instead constitute general collateral challenges to unconstitutional practices and policies used by the agency." Walters v. Reno, 145 F.3d 1032, 1052 (9th Cir. 1998) (internal citation marks omitted); see Barahona-Gomez v. Reno, 236 F.3d 1115, 1118 (9th Cir. 2001) (same). The Ninth Circuit has thus recognized a "distinction between challenges to individual decisions covered by Section 1252(g) and broader due process challenges to policies and procedures employed by immigration officials[,]" Castellar v. Nielsen, 2018 WL 786742, *11 (S.D. Cal. 2018), and has "consistently held that district courts have jurisdiction when . . . [plaintiffs] do not directly challenge their orders of removal." Chhoeun v. Marin, 306 F.Supp.3d 1147, 1158 (C.D. Cal. 2018) (citing United States v. Hovsepian, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc); see also NWDC Resistance v. Immigr. & Customs Enf't, 493 F.Supp.3d 1003, 1010 (W.D. Wash. 2020) ("Congress did not intend Section 1252(g) to 'deny any judicial forum for a colorable constitutional claim[.]'") (quoting Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 2054 (1988)); Cath. Soc. Servs., Inc. v. Reno, 134 F.3d 921, 927 (9th Cir. 1997) ("[A] statute that completely immunizes a statute from constitutional attack would raise difficult constitutional issues.").

Section 1252(g) therefore primarily applies to actions that challenge the Attorney General's discretion over three discrete events in the context of individual removal proceedings, rather than

general collateral challenges that may ultimately affect removal proceedings. See Walters, 145
F.3d at 1052 (concluding that § 1252(g) does not pose a bar to "general collateral challenges to
unconstitutional practices and policies" where the plaintiffs' "objective was not to obtain judicial
review of the merits of their [immigration] proceedings, but rather to enforce their constitutional
rights to due process in the context of those proceedings"); Am.-Arab Anti-Discrimination Comm.,
525 U.S. at 482, 119 S.Ct. at 943 (rejecting the idea that "§ 1252(g) covers the universe of
deportation claims"). Accordingly, a "district court may consider a purely legal question that does
not challenge the Attorney General's discretionary authority, even if the answer to that legal
question – a description of the relevant law – forms the backdrop against which the Attorney
General later will exercise discretionary authority." Hovsepian, 359 F.3d at 1155.

The court previously concluded that § 1252(g) does not preclude jurisdiction over this case
and sees no reason to revisit its conclusion. (See Dkt. 304, Liability Order at 15) (citing Dep't of
Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 19, 140 S.Ct. 1891, 1907 (2020))
("We have previously rejected as implausible the Government's suggestion that § 1252(g) covers
all claims arising from deportation proceedings or imposes a general jurisdictional limitation.")
(internal quotation marks omitted). Here, plaintiffs' claims are not "challenges to individual
decisions covered by Section 1252(g)[,]" Castellar, 2018 WL 786742, at *11, and are instead
"general collateral challenges to unconstitutional practices and policies used by the agency." See
Barahona-Gomez, 236 F.3d at 1118 (quoting Walters, 145 F.3d at 1052). Plaintiffs do not
challenge the validity of any removal proceedings or orders, or any of the three discrete actions
identified in § 1252(g). Rather, plaintiffs' action involves "a purely legal question that does not
challenge the Attorney General's discretionary authority" to undertake the three discrete actions
identified in § 1252(g). See Hovsepian, 359 F.3d at 1155.

An action seeking to require that the government provide MPP-unaccompanied children
with their statutorily mandated TVPRA rights does not challenge the Attorney General's
discretionary decision to initiate proceedings, adjudicate cases, or execute removal orders. See,
e.g., NWDC Resistance, 493 F.Supp.3d at 1011 ("A narrow reading of Section 1252(g) does not
apply to constitutional challenges brought by one who is not the [noncitizen] subject to the three

1  discrete decisions articulated in that statute, or one who is not bringing a challenge to such actions

2  on the [noncitizen's] behalf."); Barahona-Gomez, 236 F.3d at 1120-21 (concluding that § 1252(g)

3  did not apply to challenge to the issuance of decisions granting suspension of deportation because

4  the statute "does not remove from judicial review actions in violation of mandatory duties of IJs

5  and the BIA conducted pursuant to the usual rules of administrative procedure").  The government

6  cites no cases to the contrary.  (See, generally, Dkt. 309, Opp.).  Thus, guided by the Supreme

7  Court's "instruction to interpret § 1252(g) narrowly," Hovsepian, 359 F.3d at 1155, "by the general

8  rule to resolve any ambiguities in a jurisdiction-stripping statute in favor of the narrower

9  interpretation, and by the strong presumption in favor of judicial review," Arce v. United States, 899

10  F.3d 796, 801 (9th Cir. 2018) (internal citation and quotation marks omitted), the court concludes

11  that § 1252(g) does not bar plaintiffs' claims or requested relief.  See, e.g., Chhoeun, 306

12  F.Supp.3d at 1159 (finding § 1252(g) did not preclude jurisdiction to consider "claims regarding

13  due process violations" seeking "a day in court to comport with due process") (internal quotation

14  marks omitted).

15         2.  **Section 1252(b)(9)**.

16         The government also argues that plaintiffs' requested relief is barred by 8 U.S.C.

17  § 1252(b)(9).  (See Dkt. 309, Opp. at 5).[6]  This provision provides, in relevant part, that:  "Judicial

18  review of all questions of law and fact, including interpretation and application of constitutional and

19  statutory provisions, arising from any action taken or proceeding brought to remove [a noncitizen]

20  from the United States under this subchapter shall be available only in judicial review of a final

21  order under this section."  8 U.S.C. § 1252(b)(9).  The purpose of this provision is to channel

22  judicial review of claims that arise from the removal process to the appropriate court of appeal.

23  See Am.-Arab Anti-Discrimination Comm., 525 U.S. at 478, 483 119 S.Ct. at 941, 943 (describing

24  § 1252(b)(9) as a channeling provision); Singh v. Gonzales, 499 F.3d 969, 978 n. 11 (9th Cir.

25

26  _____

27       [6]  In its opposition, the government purports to quote from § 1252(b)(9) but instead quotes the text of § 1252(g).  (See Dkt. 309, Opp. at 5).  Apparently confused about which provision it is arguing about, the § 1252(b)(9) portion of its brief recycles arguments made as to § 1252(g) and

28  fails to analyze the text of § 1252(b)(9).  (See id.).

2007) ("Congress' purpose in enacting § 1252(b)(9) in 1996 was simply to consolidate judicial review of immigration proceedings into one action in the court of appeals.") (internal quotation marks omitted).  "This statutory scheme was designed to limit all [noncitizens] to one bite of the apple with regard to challenging an order of removal." Martinez v. Napolitano, 704 F.3d 620, 622 (9th Cir. 2012) (internal quotation marks omitted).

The court previously found that § 1252(b)(9) does not bar judicial review because the legal and factual questions in this case do not "aris[e] from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9); (see Dkt. 304, Liability Order at 14-15) (citing Regents, 591 U.S. at 19, 140 S.Ct. at 1907) ("[Section] 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision . . . to seek removal, or the process by which . . . removability will be determined. . . . And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings.") (internal quotation marks omitted)); see also E. Bay I, 993 F.3d at 666 ("[C]laims that are independent of or collateral to the removal process are not actions taken to remove an alien from the United States.") (internal quotation marks omitted).  The court again finds that § 1252(b)(9) poses no bar.

Plaintiffs do not ask "for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." Gonzalez, 975 F.3d at 810 (internal quotation marks omitted).  Instead, plaintiffs challenge the Policy and its effects on their ability to provide advice and representation to MPP-unaccompanied children.  The relief they seek – vacatur of the Policy and procedural safeguards to ensure TVPRA rights – does not challenge any removal decision or order and does not implicate the channeling purpose of § 1252(b)(9).  See NWDC Resistance, 493 F.Supp.3d at 1012 ("[T]he Ninth Circuit distinguishes between impermissible indirect challenges to removal decisions and orders, and permissible independent claims."); Las Americas Immigrant Advoc. Ctr. v. Trump, 475 F.Supp.3d 1194, 1209 (D. Or. 2020) ("Allowing organizational plaintiffs to bring claims alleging systemic problems, independent of any removal orders, that allegedly cause harms specific to those organizations does not thwart the purpose of § 1252(b)(9)."); Immigrant Defs. L. Ctr. v. Noem ("ImmDef I"), 781 F.Supp.3d 1011, 1044 (C.D.

1  Cal. 2025) ("[C]ourts in this Circuit have found that organizational plaintiffs' claims are not barred

2  under Section 1252(b)(9)."). Section "1252(b)(9) is a 'targeted' and 'narrow' provision that 'is

3  certainly not a bar where, as here, the parties are not challenging any removal proceedings.'"

4  Gonzalez, 975 F.3d at 810 (quoting Regents, 591 U.S. at 19, 140 S.Ct. at 1907); see also

5  Jennings, 583 U.S. at 292-94, 138 S.Ct. at 840-41 (cautioning that phrases like "arising from"

6  should be read narrowly and rejecting an expansive reading of (b)(9) that would encompass any

7  deportation-related claim).

8        Here, "it is enough to note that [plaintiffs] are not asking for review of an order of removal;

9  they are not challenging the decision to detain them in the first place or to seek removal; and they

10  are not even challenging any part of the process by which their removability will be determined."

11  Jennings, 583 U.S. at 294, 138 S.Ct. at 841. Thus, the bar does not apply to plaintiffs' claims or

12  requested relief. See, e.g., NWDC Resistance, 493 F.Supp.3d at 1013 (concluding § 1252(b)(9)

13  did not bar APA and constitutional challenge to ICE policy or requested relief where the plaintiffs

14  did not "seek review of any removal order and [we]re not challenging any part of the process by

15  which their removability will be determined[]" and did not "seek to enjoin any specific removal

16  proceeding, even if the injunction might ultimately have an impact on some removals[]"); ImmDef

17  I, 781 F.Supp.3d at 1044 (concluding § 1252(b)(9) did not bar APA challenge where the plaintiffs'

18  claims did "not directly challenge the bases for their orders of removal").

19            3.    **Section 1252(f)(1)**.

20        Finally, the government argues that 8 U.S.C. § 1252(f)(1) bars all of plaintiffs' requested

21  relief. (See Dkt. 309, Opp. at 1-4). Section 1252(f)(1), entitled "[l]imit on injunctive relief[,]"

22  provides that:

23                  Regardless of the nature of the action or claim or of the identity of the party

24                  or parties bringing the action, no court (other than the Supreme Court) shall

25                  have jurisdiction or authority to enjoin or restrain the operation of the

26                  provisions of part IV of this subchapter, as amended by the Illegal

27                  Immigration Reform and Immigrant Responsibility Act of 1996, other than

28

1                with respect to the application of such provisions to an individual alien against

2                whom proceedings under such part have been initiated.

3  8 U.S.C. § 1252(f)(1).

4        Given the use of "enjoin or restrain" and the section's title ("Limit on injunctive relief"), §

5  1252(f)(1) has been understood to limit only the power to enter certain kinds of classwide

6  injunctive relief. See Am.-Arab Anti-Discrimination Comm., 525 U.S. at 481, 119 S.Ct. at 942 ("By

7  its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive

8  relief."). It does not bar or otherwise affect plaintiffs' request for vacatur of the Policy or

9  declaratory relief. See Al Otro Lado v. Exec. Off. for Immigr. Rev., 138 F.4th 1102, 1123 (9th Cir.

10  2025) (holding that § 1252(f)(1) does not bar classwide declaratory relief and affirming the district

11  court's entry of such relief); Rodriguez v. Hayes, 591 F.3d 1105, 1119 (9th Cir. 2010), abrogated

12  on other grounds by Jennings, 583 U.S. 281, 138 S.Ct. 830 ("Section 1252(f) was not meant to

13  bar classwide declaratory relief. Congress knew how to say 'declaratory relief' in enacting the

14  IIRIRA, but it chose not to use it in Section 1252(f)."); ImmDef I, 781 F.Supp.3d at 1040-41 (C.D.

15  Cal. 2025) (collecting cases opining that § 1252(f) does not bar vacatur); Kidd v. Mayorkas, 734

16  F.Supp.3d 967, 986 (C.D. Cal. 2024) ("[T]he Court can issue declaratory relief – which is not

17  precluded by § 1252(f) – and also vacate and set aside Defendants' unlawful policies and training

18  materials under the APA.").[7] Section 1252(f)(1) is not a threshold jurisdictional bar; it precludes

19  only certain kinds of classwide injunctive relief – relief that enjoins or restrains the operation of

20  certain provisions. See 8 U.S.C. § 1252(f)(1). The court thus considers § 1252(f)(1) in greater

21  depth when it analyzes the appropriate remedy and scope of relief. See infra at § II.C.2.

22  / / /

23

24

25        [7] See also Nat'l TPS All. v. Noem, 773 F.Supp.3d 807, 825-26, 829 (N.D. Cal. 2025) (discussing the difference between vacatur and injunctive relief, and observing that no court has

26  found that § 1252(f)(1) applies to vacatur); Biden v. Texas, 597 U.S. at 798, 142 S.Ct. at 2539 (Section 1252(f)(1)'s "title – 'Limit on injunctive relief' – makes clear the narrowness of its scope.");

27  California v. Arizona, 452 U.S. 431, 432, 101 S.Ct. 2445, 2445 (1981) (using "enjoined and restrained" to describe an injunction); Texas v. United States, 40 F.4th at 219 (noting that there

28  are meaningful differences between an injunction and vacatur).

C.    <u>Plaintiffs' Motion to Strike Post-Trial Evidence</u>.

Plaintiffs seek to strike three declarations, (<u>see</u> Dkt. 312, Motion to Strike Defendants' Declarations at 1), the government attached to its Opposition to plaintiffs' Remedies Brief.  (<u>See</u> Dkt. 309, Opp. at 8 & 11); (Dkt. 309-1, Declaration of Byoung Park); (Dkt. 309-2, Declaration of Matthew S. Davies); (Dkt. 309-3, Declaration of Ricardo Moreno).  The declarations, which constitute post-trial evidence, are untimely and improper.

The government chose not to call any witnesses or submit any evidence at trial, (<u>see</u>, <u>generally</u>, Dkt. 270, List of Exhibits and Witnesses at Trial); (Dkt. 284, Reporters Transcript of Bench Trial on November 7, 2023), and it has not provided an adequate justification as to why the court should consider its belated, post-trial evidence.  (<u>See</u>, <u>generally</u>, Dkt. 314, Opposition to Plaintiffs' Motion to Strike).  In any event, allowing such evidence at this stage of the case would prejudice plaintiffs.  <u>See</u>, <u>e.g.</u>, <u>United States v. Sweeney</u>, 2022 WL 17555626, *4 (E.D. Cal. 2022) (declining to consider the government's post-trial evidence and ordering "the appropriate remedies based solely on the trial record and the post-trial briefing" where "[n]o party requested an evidentiary hearing"); <u>United States v. Hill</u>, 72 F.Supp.3d 1111, 1112 n. 2 (N.D. Cal. 2014) (granting motion to strike untimely declaration testimony submitted after evidentiary hearings on motion to suppress had concluded); <u>Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.</u>, 2008 WL 6873811, *3 (C.D. Cal. 2008), <u>overruled on other grounds by</u> <u>Halo Elecs., Inc. v. Pulse Elecs., Inc.</u>, 579 U.S. 93, 107, 136 S.Ct. 1923, 1934 (2016) (concluding that post-trial declaration regarding company's ability to satisfy damages verdict was inadmissible where the party "never disclosed [the evidence] in discovery, nor in pretrial disclosures"); <u>see</u> <u>also</u> <u>Elbert v. Howmedica, Inc.</u>, 143 F.3d 1208, 1209 (9th Cir. 1998) ("[W]hen ruling on a Rule 50(b) motion, . . . [t]he record should be taken as it existed when the trial was closed.").  In sum, plaintiffs' Motion to Strike Defendants' Declarations (Dkt. 312) is granted.  The declarations attached to the government's opposition (Dkt. 309) are hereby stricken.  (<u>See</u> Dkt. 309-1, Declaration of Byoung Park); (Dkt. 309-2, Declaration of Matthew S. Davies); (Dkt. 309-3, Declaration of Ricardo Moreno).

/ / /

1              D.    <u>The Government had Adequate Notice of Plaintiffs' Requested Relief.</u>

2          The government argues that plaintiffs "never previously requested the injunction they now

3  seek, and they likewise never asked for vacatur until trial." (Dkt. 309, Opp. at 6).  Specifically, the

4  government contends that plaintiffs sought a different injunction in their motion for preliminary

5  injunction than the permanent injunction they now seek, and that the "operative complaint did not

6  request vacatur." (<u>Id.</u>).  According to the government, plaintiffs should not be permitted to request

7  either form of relief.  (<u>See id.</u>).  The government's contentions stretch the bounds of credibility and

8  fail to account for the procedural history of this case.  As an initial matter, the government has had

9  notice of plaintiffs' requested relief for nearly two years. (<u>See</u> Dkt. 268, Pretrial Conference Order)

10  (issued November 7, 2023).  Further, plaintiffs' First Amended Complaint sought injunctive relief

11  and at least implicitly identified the APA's presumptive remedy of vacatur. (<u>See</u> Dkt. 214, First

12  Amended Complaint at ¶ 259 & Prayer for Relief).  Their motion for preliminary injunction sought

13  an injunction enforcing MPP-unaccompanied children's rights under the TVPRA. (<u>See</u> Dkt. 29,

14  Plaintiffs' Motion for Preliminary Injunction at 1-2); (Dkt. 69, Plaintiffs' Renewed Motion for

15  Preliminary Injunction at 2-3).  However, instead of ruling on the motion for preliminary injunction,

16  the court decided to advance the trial on the merits and consolidate it with the hearing on the

17  motion for preliminary injunction. (<u>See</u> Dkt. 163, Minutes of Plaintiff's Renewed Motion for

18  Preliminary Injunction); Fed. R. Civ. P. 65(a)(2).  Thus, the fact that the relief plaintiffs sought in

19  their motion for preliminary injunction may differ from the relief they seek as part of a permanent

20  injunction is irrelevant to the notice question.  It was only after the court advanced the trial on the

21  merits and consolidated it with the hearing on the preliminary injunction that plaintiffs had to

22  identify the permanent injunctive relief they sought – and they did.  The parties' proposed pre-trial

23  conference order, which the court adopted, expressly contemplated vacatur of the Policy and

24  permanent injunctive relief. (<u>See</u>, <u>e.g.</u>, Dkt. 264-1, Proposed Joint Pretrial Conference Order at

25  17-18); (Dkt. 268, Pretrial Conference Order at 8.N-O) ("N. Should Defendants Policy be declared

26  unlawful and vacated under the Administrative Procedure Act?  O. Should declaratory and

27  injunctive relief be issued to require Defendants to develop procedural safeguards that permit all

28  MPP-unaccompanied children to access their constitutionally protected property rights in

affirmative asylum and voluntary departure[?]").  Plaintiffs' requested relief was within the scope of issues litigated at trial, and the court provided the parties an additional opportunity to separately brief the scope of the remedies after it made its liability findings.  (See Dkt. 269, Minutes of Court Trial); (Dkt. 304, Liability Order at 30-31).

Moreover, even assuming the scope of the relief plaintiffs sought was not identified in the pretrial conference order, that would not change the result because the scope of relief warranted in a case evolves depending on the court's findings at trial, and the decision regarding the proper remedy and the scope of any injunctive relief ultimately rests with the court.  See Fed. R. Civ. P. 54(c) (A final judgment, other than a default judgment, "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); Peterson v. Bell Helicopter Textron, Inc., 806 F.3d 335, 340 (5th Cir. 2015) ("Rule 54(c) authorizes district courts to grant any appropriate relief following a general prayer by the plaintiff, even if the plaintiff did not specifically seek it, but only where relief is otherwise legally permitted. . . .  The discretion afforded by Rule 54(c) . . . assumes that a plaintiff's entitlement to relief not specifically pled has been tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant."); Nat'l Wildlife Fed'n, 524 F.3d at 936 ("The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong[.]"); see also Miller v. Safeco Title Ins. Co., 758 F.2d 364, 368 (9th Cir. 1985) ("A pretrial order, however, should be liberally construed to permit any issues at trial that are embraced within its language.  Moreover, a pretrial order may be amended informally by a trial court's findings when facts supporting those findings were put before the court.") (internal citation and quotation marks omitted).  In short, the government had more than adequate notice and multiple opportunities to address all remedies issues.

II.    REMEDIES.

Having concluded that plaintiffs have standing, and that no jurisdictional bars apply to their claims, the court turns to plaintiffs' requested relief and the scope of the appropriate remedies.

/ / /

1    A.    <u>Vacatur</u>.

2    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency

3    action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

4    otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In its Liability Order, the court found

5    that the government's Policy violates the APA because: (1) "the Policy directly conflicts with the

6    protections enshrined in the TVPRA, and is therefore contrary to law"; and (2) it is arbitrary and

7    capricious "because defendants failed to adequately explain their decision and consider an

8    important aspect of the problem in developing the Policy[.]" (Dkt. 304, Liability Order at 18).

9    "[V]acatur is the presumptive remedy under the APA[.]" <u>350 Montana</u>, 50 F.4th at 1273;

10   <u>see</u> <u>All. for the Wild Rockies v. U.S. Forest Serv.</u>, 907 F.3d 1105, 1121 (9th Cir. 2018) (noting that

11   vacatur of "unlawful agency action normally accompanies a remand"); <u>Cal. Wilderness Coal. v.</u>

12   <u>U.S. Dep't of Energy</u>, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an

13   agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that

14   action."); <u>East Bay I</u>, 993 F.3d at 681 (noting that the "typical response" to unlawful agency action

15   is to "vacate the rule").[8] Plaintiffs seek vacatur of the Policy to "return Plaintiffs, their clients, and

16   Defendants to the *status quo ante* in which all unaccompanied children are entitled to the full

17   protections of the TVPRA." (Dkt. 307, Plaintiffs' Post-Trial Remedies Brief at 5).

18   To determine whether vacatur is appropriate, courts "weigh the seriousness of the agency's

19   errors against 'the disruptive consequences of an interim change that may itself be changed.'" <u>Ctr.</u>

20   <u>for Food Safety v. Regan</u>, 56 F.4th 648, 663 (9th Cir. 2022) (internal quotation marks omitted).

21   In weighing the seriousness of the errors, the court considers "whether the agency would likely

22   be able to offer better reasoning or whether by complying with procedural rules, it could adopt the

23   same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely

24   that the same rule would be adopted on remand." <u>Id.</u> at 663-64.

25

26   _____

27   [8]  Although courts will, "on occasion, remand[] a rule without vacatur, . . . Defendants cite no
     authority suggesting that any remedy short of vacatur is appropriate here." <u>Refugee & Immigrant</u>
28   <u>Ctr. for Educ. & Legal Servs. v. Noem</u>, 2025 WL 1825431, *50 (D.D.C. 2025).

1    Here, the relevant factors here counsel strongly in favor of vacatur.  First, the agency's

2    errors are severe and imperil the rights of a particularly vulnerable population – unaccompanied

3    children.  (See, e.g., Dkt. 304, Liability Order at 22-23, 28).  Because the Policy impairs plaintiffs'

4    ability to represent unaccompanied children, it implicates significant access to counsel concerns.

5    See 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5) (providing that the government "shall ensure, to the

6    greatest extent practicable . . . that all unaccompanied [noncitizen] children . . . have counsel to

7    represent them in legal proceedings or matters and protect them from mistreatment, exploitation,

8    and trafficking"); 8 U.S.C. § 1362 (providing that "[i]n any removal proceedings . . . the person

9    concerned shall have the privilege of being represented (at no expense to the Government) by

10   such counsel, authorized to practice in such proceedings, as he shall choose").  And because the

11   Policy undermines plaintiffs' ability to help unaccompanied children access their statutorily-

12   mandated protections, it increases the risk that such children will be deported unlawfully and

13   frustrates significant public interests codified in the TVPRA.  See Flores v. Sessions, 862 F.3d

14   863, 880 (9th Cir. 2017) ("The overarching purpose of the . . . TVPRA was quite clearly to give

15   unaccompanied minors more protection, not less. . . .  [I]n passing the TVPRA, Congress sought

16   to improve the procedures governing the treatment of unaccompanied minors."); see also E. Bay

17   Sanctuary Covenant v. Garland (E. Bay II), 994 F.3d 962, 983 (9th Cir. 2020) ("In 2008, in

18   recognition of the vulnerability of unaccompanied minors seeking asylum, Congress amended the

19   INA to provide them special protection."); E. Bay I, 993 F.3d at 678 ("[T]he public has an interest

20   in ensuring that we do not deliver [noncitizens] into the hands of their persecutors, and preventing

21   [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face

22   substantial harm[.]") (internal citations and quotation marks omitted).

23   Second, vacatur of the Policy would result in minimal disruptive consequences, as it would

24   restore the status quo whereby all unaccompanied children receive the protections afforded to

25   them by the TVPRA.  Given the importance of these protections and the adverse impact the Policy

26   has on plaintiffs, leaving the Policy in place risks further harm to plaintiffs and

27   MPP-unaccompanied children.  Vacating the Policy is likely to cause only minimal disruptive

28   consequences given that MPP-unaccompanied children represent a relatively small population of

1  those encountered at the border, and the government already has procedures for screening

2  unaccompanied children.  (See Dkt. 304, Liability Order at 12-13) (detailing statistics); 8 U.S.C.

3  § 1232(b) (providing for placement of unaccompanied minors in HHS's custody and notification

4  to HHS when a federal agency apprehends an unaccompanied minor or suspects that it has an

5  unaccompanied minor in its custody).  Under the circumstances, the seriousness of the agency's

6  errors requires vacatur to eliminate the government's unlawful practices.  And because the Policy

7  directly conflicts with the TVPRA, it is unlikely that a similar Policy could be adopted on remand.

8  See North Carolina v. EPA, 531 F.3d 896, 929 (D.C. Cir. 2008) ("[T]he threat of disruptive

9  consequences cannot save a rule when its fundamental flaws foreclose [the agency] from

10 promulgating the same standards on remand[.]") (internal quotation marks omitted); Nat'l Fam.

11 Farm Coal. v. EPA, 960 F.3d 1120, 1145 (9th Cir. 2020) (concluding that vacatur was necessary

12 because "the fundamental flaws in the [agency's] analysis are so substantial that it is exceedingly

13 unlikely that the same rule would be adopted on remand") (internal quotation marks omitted).  In

14 short, the court finds that the proper remedy in this case includes vacatur of the Policy.  This

15 remedy "will afford much – although not all – of the relief that Plaintiffs seek in this case." Refugee

16 & Immigrant Ctr., 2025 WL 1825431 at *51.

17      B.    Declaratory Judgment.

18 Plaintiffs seek declaratory relief to reaffirm the TVPRA rights of MPP-unaccompanied

19 children, "resolve Plaintiffs' continued uncertainty around application of the TVPRA in connection

20 with MPP," and "provide Defendants clarity regarding permissible future treatment of this

21 vulnerable population of children," particularly in light of the reinstatement of MPP.  (See Dkt. 307,

22 Plaintiffs' Post-Trial Remedies Brief at 6-7).

23 The Declaratory Judgment Act, 28 U.S.C. § 2201, gives courts the authority to issue

24 declaratory relief.  See 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction,

25 . . . any court of the United States . . . may declare the rights and other legal relations of any

26 interested party seeking such declaration[.]").  "Declaratory relief is appropriate '(1) when the

27 judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2)

28 when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise

19

to the proceeding.'" Carroll Shelby Licensing, Inc. v. Halicki, 138 F.4th 1178, 1189 (9th Cir. 2025) (quoting Small v. Allianz Life Ins. Co. of N. Am., 122 F.4th 1182, 1201 (9th Cir. 2024)); see also Trinh v. Homan, 466 F.Supp.3d 1077, 1094 (C.D. Cal. 2020) ("Typically, declaratory relief targets prospective conduct.  Declaratory judgments are used to afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.") (internal quotation marks omitted).

Declaratory relief is warranted here, as it will clarify and settle the legal relations at issue between the government, plaintiffs, and MPP-unaccompanied children, and afford plaintiffs relief from the uncertainty giving rise to this proceeding.  See, e.g., Kidd, 734 F.Supp.3d at 987 ("[T]he Court deems declaratory judgment to be appropriate in this case, as it will serve a useful purpose in clarifying and settling the legal relations between the parties.") (internal quotation marks omitted); Al Otro Lado, 138 F.4th at 1123-24 (affirming grant of declaratory relief where district court stated that CBP policy violated certain provisions of the INA).  As noted above, see supra at § I.A, plaintiffs have established the possibility of prospective harm such that a declaratory judgment is appropriate.  See Trinh, 466 F.Supp.3d at 1094 ("What makes a declaratory judgment 'a proper judicial resolution of a "case or controversy" rather than an advisory opinion – is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff.'") (quoting Hewitt v. Helms, 482 U.S. 755, 761, 107 S.Ct. 2672, 2676 (1987)).

Plaintiffs request a declaration that "all unaccompanied children are entitled to:  (1) the processing of asylum claims in the first instance through affirmative applications adjudicated by USCIS [United States Citizenship and Immigration Services] through a nonadversarial process; (2) extended timelines to develop claims for immigration relief, including exemption from the one-year deadline that applies to applications for asylum; (3) access to legal counsel; (4) to the extent that DHS seeks to remove an unaccompanied child, placement in new § 240 removal proceedings that employ child-sensitive procedures; (5) a guarantee that a child's prior removal orders will not be reinstated; and (6) the ability to elect voluntary departure."  (Dkt. 307, Plaintiffs' Post-Trial Remedies Brief at 6).  Plaintiffs also seek a declaration that due process "requires that unaccompanied children and their legal counsel receive reasonable notice of prior MPP ties in

order to help facilitate their access to the procedural protections described above." (Dkt. 307-1, Proposed Final Judgment and Permanent Injunction at 2-4).

In its Liability Order, the court found that the Policy was contrary to law because: (1) the use of the prospective "shall" in 8 U.S.C. § 1232(a)(5)(D)(i) requires placement in new § 240 removal proceedings to the extent that DHS seeks to remove an unaccompanied child, (see Dkt. 304, Liability Order at 23-24); (2) prosecuting § 240 proceedings or removing MPP-unaccompanied children before their affirmative asylum claims are adjudicated by USCIS violates the guarantee in 8 U.S.C. § 1158(b)(3)(C) that "[a]n asylum officer . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child," (see Dkt. 304, Liability Order at 25-26); (3) prosecuting § 240 proceedings or removing MPP-unaccompanied children before they have the opportunity to apply for asylum renders their right to apply for affirmative asylum (and exemption from the one-year deadline) essentially meaningless, (see Dkt. 304, Liability Order at 25-26); (4) deeming MPP-unaccompanied children with a prior final removal order ineligible for voluntary departure violates 8 U.S.C. § 1232(a)(5)(D)(ii)'s guarantee that "[a]ny unaccompanied alien child sought to be removed . . . shall be . . . eligible for relief under . . . 8 U.S.C. [§] 1229c" – that is, voluntary departure – "at no cost to the child[.]" (See Dkt. 304, Liability Order at 25-26). The court also found that due process protects MPP-unaccompanied children's statutory entitlements to TVPRA protections, including the right to apply for affirmative asylum with USCIS in the first instance, see 8 U.S.C. § 1158(b)(3)(C), and to seek voluntary departure before a removal order is issued. See id. at § 1232(a)(5)(D)(ii); (Dkt. 304, Liability Order at 29). Finally, the court concluded that defendants deny these property interests by failing to notify to MPP-unaccompanied children of their MPP status, and seeking to deport them before they have a meaningful opportunity to access the protections available to them under the TVPRA. (See Dkt. 304, Liability Order at 29-30). In light of the court's findings that the government's Policy violates the APA, TVPRA, INA, and the Due Process Clause, the court will enter declaratory relief as set forth below.

/ / /

1          C.      Injunctive Relief.

2          Finally, plaintiffs seek injunctive relief to "redress the informational vacuum created by the

3 Policy at the core of Plaintiff's due process claims," and to "ensure that adequate safeguards are

4 adopted to protect TVPRA rights and remedy ongoing harm to the Plaintiffs[.]" (Dkt. 307, Plaintiff's

5 Post-Trial Remedies Brief at 1). Plaintiffs request that the court enjoin defendants from enforcing

6 the Policy and require the government to: (1) adopt safeguards to ensure that

7 MPP-unaccompanied children are able to apply for affirmative asylum with USCIS, see 8 U.S.C.

8 § 1158(b)(3)(C); (2) adopt safeguards to ensure that MPP-unaccompanied children are placed in

9 new § 240 proceedings if the government seeks to remove them, see 8 U.S.C. § 1232(a)(5)(D)(i);

10 (3) adopt safeguards to ensure that MPP-unaccompanied children can seek voluntary departure,

11 see 8 U.S.C. § 1232(a)(5)(D)(ii); (4) identify MPP-unaccompanied children encountered by

12 defendants and provide adequate and timely notice of MPP ties to plaintiffs and their counsel, the

13 MPP-unaccompanied children, and the ORR shelters in which any such children are housed; (5)

14 publish guidance on the procedures applicable to MPP-unaccompanied children, including an

15 explanation of the safeguards adopted and the steps taken by the agencies to ensure compliance

16 consistent with the TVPRA; and (6) file a Status Report every three months regarding compliance

17 with the injunctive relief imposed by the court. (See Dkt. 307-1, Proposed Final Judgment and

18 Permanent Injunction at 4-7).

19          The court first assesses whether an injunction is warranted, and then considers the scope

20 of the injunction.

21                        1.      **Whether an Injunction is Warranted in this Case**.

22          Although vacatur is the presumptive remedy under the APA, courts also routinely issue

23 injunctions in order to afford compete relief. See, e.g., Al Otro Lado, 138 F.4th at 1126-27 (largely

24 affirming permanent injunction in immigration case); Galvez v. Jaddou, 52 F.4th 821, 826 (9th Cir.

25 2022) (same). When appropriate, courts may order both vacatur and injunctive relief. See, e.g.,

26 Refugee & Immigrant Ctr., 2025 WL 1825431, at *55 (ordering vacatur of agency action and

27 awarding injunctive relief); Scholl v. Mnuchin, 494 F.Supp.3d 661, 692 (N.D. Cal. 2020) (vacating

28 unlawful policy and issuing permanent injunction); N. Plains Res. Council v. U.S. Army Corps of

Engrs, 460 F.Supp.3d 1030, 1036 (D. Mont. 2020) (vacating agency action and issuing injunctive relief); Pacito v. Trump, 772 F.Supp.3d 1204, 1218 (W.D. Wash. 2025) (setting aside agency action and issuing injunctive relief). However, "the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" Refugee & Immigrant Ctr., 2025 WL 1825431, at *54 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165, 130 S.Ct. 2743, 2761 (2010)).

The court has identified both APA and due process violations, the latter of which will not be wholly remedied by vacatur of the Policy.[9]  In carrying out its Policy, the government fails to notify MPP-unaccompanied children of their MPP status and often seeks to deport them quickly, thereby depriving them of a meaningful opportunity to access their rights under the TVPRA.  (See Dkt. 304, Liability Order at 29-30).  For instance, the court found that some MPP-unaccompanied children were deported before they could access the TVPRA protections to which they are entitled, (see id. at 13-14), including their right to seek asylum on a slower timeline and the right to have their applications adjudicated by USCIS.  These actions and circumstances deprive MPP-unaccompanied children of TVPRA protections – and this deprivation constitutes a due process violation.  See, e.g., United States v. Melendez-Castro, 671 F.3d 950, 954 (9th Cir. 2012) (finding that due process requires notice of the right to seek immigration relief and an opportunity to apply for relief); Orantes-Hernandez v. Meese, 685 F.Supp. 1488, 1504-05 (C.D. Cal. 1988) (finding that coercive practice violated constitutional right to due process and statutory right to apply for asylum and withholding).

---

[9]  The court addressed plaintiffs' due process claims in its Liability Order because these claims potentially entitled them to relief beyond vacatur of the Policy.  (See, e.g., Dkt. 304, Liability Order at 29-30) (discussing lack of safeguards and notice); see also Al Otro Lado, 138 F.4th at 1123 (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 446, 108 S.Ct. 1319, 1320 (1988) (The principle of constitutional avoidance "requires courts 'to determine, before addressing [a] constitutional issue, whether a decision on that question could have entitled [the plaintiffs] to relief beyond that to which they were entitled on their statutory claims.'").  The court concludes that these claims warrant additional relief, and considers the appropriate remedy in this Order.

Under the circumstances, the court finds that additional safeguards are necessary to ensure MPP-unaccompanied children have a meaningful opportunity to access their rights under the TVPRA.  While vacatur of the Policy will help ensure that the government does not subject MPP-unaccompanied children to their family's previously initiated § 240 proceeding, including any pending proceeding and/or previously issued final removal order, (see Dkt. 304, Liability Order at ¶ 26) (defining Policy), the manner in which the government carries out its Policy deprives MPP-unaccompanied children of their TVPRA rights.  Accordingly, the court proceeds to consider whether plaintiffs have met the standard for a permanent injunction.  See E. Bay I, 993 F.3d at 680 (noting that the appropriate equitable remedy is that which is "necessary to give prevailing parties the relief to which they are entitled").

To obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 1839 (2006).  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity[.]"  Id. at 394, 126 S.Ct. at 1841.

The court is persuaded that the eBay factors are satisfied here.  First, plaintiffs have suffered an irreparable injury.  See eBay, 547 U.S. at 391, 126 S.Ct. at 1839.  The government's Policy and related practices toward MPP-unaccompanied children have interfered with plaintiffs' core business activities.  (See Dkt. 304, Liability Order at 16-17).  That is, plaintiffs' provision of legal services, advice and/or representation to MPP-unaccompanied children has been adversely affected by the government's: (1) failure to notify MPP-unaccompanied children or their counsel of the children's MPP-status; (2) practice of often moving to quickly remove MPP-unaccompanied children; and (3) failure to afford plaintiffs' clients their rights under the TVPRA.  (See id. at 13-14, 16-17).  The number of MPP-unaccompanied children encountered by defendants has increased, and DHS has attempted to, and has removed unaccompanied children who had meritorious claims

for immigration relief.  (See id. at 13-14).  Because the Policy remains in place and MPP has been reinstated, plaintiffs' injury is ongoing and prospective.  See, e.g., ImmDef I, 781 F.Supp.3d at 1033-34 (C.D. Cal. 2025) ("[T]he Court finds that ImmDef has provided ample evidence addressing how the reimplementation of MPP will irreparably harm its core business activities."); Vasquez Perdomo v. Noem, 2025 WL 1915964, *15 (C.D. Cal. 2025) ("Government action that frustrates an organization's core missions gives rise to irreparable harm.") (citing E. Bay I, 993 F.3d at 677-78).  The record thus reflects that plaintiffs have suffered a significant, irreparable injury.[10]

Second, legal remedies are inadequate to redress plaintiffs' injury.  See eBay, 547 U.S. at 391, 126 S.Ct. at 1839.  Here, any intangible or economic harms from the impact to plaintiffs' core business activities can only be addressed by equitable remedies.  See E. Bay I, 993 F.3d at 677 ("[W]here parties cannot typically recover monetary damages flowing from their injury – as is often the case in APA cases – economic harm can be considered irreparable.  Intangible injuries may also qualify as irreparable harm, because such injuries generally lack an adequate legal remedy.") (internal citations and quotation marks omitted).

Third, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted.  See eBay, 547 U.S. at 391, 126 S.Ct. at 1839.  The hardships plaintiffs face are significant.  When the government enforces the Policy, fails to notify MPP-unaccompanied children and their counsel of their MPP status, or seeks to remove MPP-unaccompanied children before they can access TVPRA protections, these actions deprive

---

[10] The government also argues that "Plaintiffs face nothing like extreme damage from their voluntary decision to continue representing this small population of individuals."  (Dkt. 309, Opp. at 10).  But in asserting that "extreme damage" is required, the government "errs by relying on cases that concern mandatory preliminary injunctions" – in the case of a mandatory permanent injunction, a plaintiff "must show actual success on the merits," and therefore "need not show that extreme or very serious damage will result, as is required for mandatory preliminary injunctions." Edmo v. Corizon, Inc., 935 F.3d 757, 784 n. 13 (9th Cir. 2019) (internal quotation marks omitted). In any event, being unable to provide legal services or advice, or otherwise adequately represent your client – an unaccompanied minor – because they are deported before they can access procedural safeguards or critical information, no doubt represents a severe impairment of the attorney-client relationship.

1    children of their rights under the TVPRA and substantially impair plaintiffs' ability to represent

2    current and prospective clients.  As a practical matter, this means many MPP-unaccompanied

3    children are not provided access to counsel to the greatest extent practicable, an opportunity to

4    seek asylum beyond the typical one-year deadline, or the chance to have their application

5    adjudicated by USCIS.  See 8 U.S.C. § 1158(a)(2)(E), (b)(3)(C); 8 U.S.C. § 1232(a)(5)(D)(i)-(iii).

6    The government thus violates the Due Process Clause because it deprives MPP-unaccompanied

7    children of these rights and risks deporting – or actually deports – unaccompanied children to

8    places where they may face unsafe conditions or persecution.  It would make little sense for

9    Congress to exempt unaccompanied children from the one-year deadline for seeking asylum, 8

10   U.S.C. § 1158(a)(2)(E), and provide for access to counsel "to the greatest extent practicable[,]"

11   8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5), while simultaneously permitting the government to remove

12   them before they have an opportunity to apply or obtain advice and/or representation from

13   plaintiffs.[11]  And it would render the TVPRA meaningless for these protections to be codified in the

14   statute, but for MPP-unaccompanied children to lack meaningful access to them in practice.

15        The government argues that "the implementation and operational burden on DHS" of

16   issuing new NTAs and commencing new proceedings "would be significant" and that "confusion"

17   would arise.  (Dkt. 309, Opp. at 11).  The government also claims that any hardship to plaintiffs

18   is minimal because plaintiffs have "adjusted their operations to address MPP-UAC; the harm they

19   allege is now a thing of the past."  (Id.).  Neither argument is persuasive.  As an initial matter, the

20   government's suggestion that plaintiffs' injuries have been remedied because they have taken

21   steps to adjust to the government's practices strains credulity – the due process and APA

22   violations remain, MPP-unaccompanied children are still being denied their rights under the

23

24

_____

25        [11]  It does not appear that MPP-unaccompanied children can meaningfully access TVPRA
     protections after they have been removed from the United States, as the asylum process and
26   TVPRA contemplate that children are present or arriving in the United States.  See 8 U.S.C.
     §§ 1158, 1232; cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 433, 107 S.Ct. 1207, 1214 (1987)
27   (noting that "§ 1158 sets out the process by which refugees currently in the United States may be
     granted asylum") (emphasis added).
28

1    TVPRA and likely being summarily removed, and plaintiffs' ability to provide advice and/or

2    represent MPP-unaccompanied children continues to be impaired.

3         Further, the operational burden of identifying MPP-unaccompanied children should be

4    minimal, as the government already appears to identify such children for removal purposes.  Once

5    these children have been identified, providing notice of their MPP status should not be

6    burdensome.  Although commencing new proceedings may increase costs, the TVPRA requires

7    that unaccompanied children receive individualized proceedings, access to counsel, extended

8    timelines to apply for asylum, and an opportunity to have their application adjudicated by USCIS.

9    See 8 U.S.C. § 1158(a)(2)(E), (b)(3)(C); 8 U.S.C. § 1232(a)(5)(D)(i)-(iii).  Related costs, if any, are

10   not new, and the government's argument that complying with the law will be costly is not well-

11   taken.  See, e.g., Rodriguez v. Robbins, 715 F.3d 1127, 1146 (9th Cir. 2013) ("[E]ven if the

12   government faced severe logistical difficulties in implementing the order[,] . . . they would merely

13   represent the burdens of complying with the applicable statutes[.]").  Taken together, "any

14   additional administrative costs to the government are far outweighed by the considerable harm

15   to Plaintiffs' constitutional rights in the absence of the injunction."  Hernandez v. Sessions, 872

16   F.3d 976, 995–96 (9th Cir. 2017).  "Faced with such a conflict between financial concerns and

17   preventable human suffering," the court has "little difficulty concluding that the balance of

18   hardships tips decidedly in plaintiffs' favor."  Id. at 996 (quoting Lopez v. Heckler, 713 F.2d 1432,

19   1437 (9th Cir. 1983)).

20        Finally, the public interests implicated by this case are significant and an injunction would

21   serve, rather than disserve, the public interest.[12]  See eBay, 547 U.S. at 391, 126 S.Ct. at 1839.

22   Courts have identified a strong public interest in "preventing [noncitizens] from being wrongfully

23   removed, particularly to countries where they are likely to face substantial harm," Nken v. Holder,

24   556 U.S. 418, 436, 129 S.Ct. 1749, 1762 (2009), and in "ensuring that we do not deliver

25   [noncitizens] into the hands of their persecutors."    East Bay I, 993 F.3d at 678 (quoting

26   _____

27   [12]  As to the fourth eBay factor, the government fails to address the significant public interests
     and, instead, offers the same argument about operational burdens discussed above.  (See Dkt.
28   309, Opp. at 11).

Leiva-Perez v. Holder, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam)). "This concern is especially pressing here," E. Bay II, 994 F.3d at 985, where, pursuant to the Policy, DHS has attempted to remove unaccompanied children who ultimately had meritorious claims for immigration relief. See, e.g., E. Bay I, 993 F.3d at 679 (expressing concern about the "wrongful removal" of asylum-seekers with meritorious claims); E. Bay II, 994 F.3d at 985 (same). The court cannot overlook the risk and significant public interest consideration that the government has removed or will remove MPP-unaccompanied children unlawfully to places where they fear persecution and may face harm. Further, the public has an interest in "ensuring that statutes enacted by [their] representatives are not imperiled by executive fiat." E. Bay I, 993 F.3d at 679 (internal quotation marks omitted). But as things stand now, the government's actions render the TVPRA largely meaningless for MPP-unaccompanied children. And merely vacating the Policy will be insufficient to remedy the due process violations. In short, the court finds that an injunction is necessary to remedy the due process violations.

### 2.   **Scope of Injunctive Relief**.

The court next considers the appropriate scope an injunction, such that it is no "broader than necessary to provide complete relief" to plaintiffs, see CASA, 145 S.Ct. at 2562-63, and in light of the limit on injunctive relief in § 1252(f)(1).

Section 1252(f)(1) only applies to classwide injunctive relief that "enjoin[s] or restrain[s] the operation of the provisions of part IV of this subchapter" – that is, the specific, covered provisions of the INA. See 8 U.S.C. § 1252(f)(1). As used in § 1252(f)(1), "'Part IV' is a reference to the provisions titled Inspection, Apprehension, Examination, Exclusion, and Removal, which currently include 8 U.S.C. §§ 1221-1232[.]" Gonzalez, 975 F.3d at 812 (internal quotation marks omitted). Section 1252(f)(1) thus limits the authority of lower courts to enter classwide injunctive relief restraining the operation of §§ 1221-1232. See Jennings, 583 U.S. at 313, 138 S.Ct. at 851. However, § "1252(f)(1) does not apply to every section codified within the specified portion of the U.S. Code, but rather applies only to such sections that are also part of the INA." Al Otro Lado, 138 F.4th at 1125 n. 15.

1    Plaintiffs' requested injunction does not implicate any sections of the INA specified in

2    § 1252(f)(1).  The TVPRA is principally codified at § 1232, see Flores v. Sessions, 862 F.3d 863,

3    870 (9th Cir. 2017), and the TVPRA provisions at issue are located in § 1232 and § 1158.[13]

4    Section 1158 is not a covered provision because it is not part of the specified sections listed in §

5    1252(f)(1).  See Al Otro Lado, 138 F.4th at 1126-27 (noting that the asylum statute, § 1158, "is not

6    covered by § 1252(f)(1)" and that "[a]t best, the law governing asylum is collateral to the process

7    of removal").

8         Although § 1232 is located in Part IV of the relevant subchapter, it is not one of the covered

9    provisions because § 1252(f)(1) applies only to Part IV "of title II [of the INA], as amended by

10   [IIRIRA] of 1996."  Galvez v. Jaddou, 52 F.4th 821, 830 (9th Cir. 2022) (internal quotation marks

11   omitted) (quoting Pub. L. No. 104-208, Div. C, § 306(a)(2), 110 Stat. at 3009-611 (1996)).  In

12   Galvez, the Ninth Circuit held that § 1232(d)(2) "is not a provision of the INA even though it has

13   been placed within Title 8, Chapter 12, Subchapter II of the United States Code" – nor is it a

14   "provision of the INA as amended by the [IIRIRA] of 1996[.]"  Id. at 830-31 (emphasis in original)

15   (internal quotation marks omitted).  The Galvez Court concluded that "the jurisdictional bar of

16   § 242(f)(1) of the INA, codified at 8 U.S.C. § 1252(f)(1), does not apply to an order that enjoin[s]

17   or restrain[s] the operation of § 235(d)(2) of the TVPRA, codified at 8 U.S.C. § 1232(d)(2)."  Id. at

18   831 (internal quotation marks omitted).  The logic of Galvez applies with equal force here; if

19   § 1232(d)(2) is not part of the INA as amended by the IIRIRA of 1996, and is not one of the

20   provisions covered by § 1252(f)(1), then neither are the provisions of § 1232 relevant here – that

21   is, 8 U.S.C. § 1232(a)(5)(D), (c)(5).  The government concedes this point.  (See Dkt. 146,

22   Defendants' Supplemental Briefing re: Aleman Gonzalez at 3) ("Defendants concede that the

23   specific statutory sections cited by Plaintiffs in their PI Motion that were enacted pursuant to the

24   TVPRA (8 U.S.C. § 1232(a)(1, 2), (a)(5)(D), (c)(1), (c)(2)(A), (c)(5), and (d)(8)) are not covered

25   by 8 U.S.C. § 1252(f)(1).").  Even so, the government contends that plaintiffs' requested injunctive

26

27

28   [13]  The specific provisions at issue in this case include: 8 U.S.C. § 1232(a)(5)(D), (c)(5),
     § 1158(a)(2)(E), (b)(3)(C).  (See Dkt. 304, Liability Order at 21, 23-24).

relief is barred by § 1252(f)(1) because it has the effect of enjoining or restraining the operation of the covered provisions. (See Dkt. 309, Opp. at 1-4). The government's contention is unpersuasive.

Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." Garland v. Aleman Gonzalez, 596 U.S. 543, 550, 142 S.Ct. 2057, 2065 (2022). However, courts may "enjoin the unlawful operation of a provision *that* is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision." Id. at 553 n. 4, 142 S.Ct. at 2067 n. 4. The Ninth Circuit "has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision." Al Otro Lado, 138 F.4th at 1125; see also id. at 1126 (noting that "[t]he Supreme Court acknowledged [the Ninth Circuit's] collateral-effect rule in Aleman Gonzalez and left it undisturbed"). In other words, the fact that an injunction may affect some of the specified provisions does not necessarily mean it is barred by § 1252(f)(1). See, e.g., Gonzales v. DHS, 508 F.3d 1227, 1233 (9th Cir. 2007) (concluding that an injunction implicating a non-covered provision merely had a collateral effect on DHS's operation of proceedings under covered provisions, and was not barred by § 1252(f)(1)); Gonzalez, 975 F.3d at 797-99, 812-15, 814 n. 17 (same); Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec., 767 F.Supp.3d 293, 319 (D. Md. 2025) ("Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority pursuant to provisions of the INA outside of §§ 1221-1232 simply because of collateral effects on a covered provision[.]").

The question here is whether plaintiffs' requested injunction enjoins or restrains the operation of the covered provisions or merely has a collateral effect on them. Plaintiffs' requested injunction would enjoin defendants from enforcing the Policy and require the government to: (1) adopt safeguards to ensure that MPP-unaccompanied children are able to apply for affirmative asylum with USCIS, see 8 U.S.C. § 1158(b)(3)(C); (2) adopt safeguards to ensure that MPP-unaccompanied children are placed in new § 240 proceedings if the government seeks to remove them, see 8 U.S.C. § 1232(a)(5)(D)(i); (3) adopt safeguards to ensure that

1  MPP-unaccompanied children can seek voluntary departure, see 8 U.S.C. § 1232(a)(5)(D)(ii); (4)

2  identify MPP-unaccompanied children encountered by defendants and provide adequate and

3  timely notice of MPP ties to plaintiffs and their counsel, the MPP-unaccompanied children, and the

4  ORR shelters in which any such children are housed; (5) publish guidance on the procedures

5  applicable to MPP-unaccompanied children, including an explanation of the safeguards adopted

6  and the steps taken by the agencies to ensure compliance consistent with the TVPRA; and (6) file

7  a Status Report every three months regarding compliance with any injunctive relief imposed by

8  the court.  (See Dkt. 307-1, Proposed Final Judgment and Permanent Injunction at 4-7).

9      An injunction that requires the government to adopt safeguards to ensure MPP-

10  unaccompanied children have a meaningful opportunity to access TVPRA protections has merely

11  a collateral effect on a removal proceeding, even though it may alter the outcome of the

12  proceeding.  See, e.g., Al Otro Lado, 138 F.4th at 1125 ("[A] court may enter a classwide

13  injunction regarding adjustment of status even though adjustment of status can change the

14  outcome of a removal proceeding under a covered provision.").  For instance, an injunction

15  ensuring that MPP-unaccompanied children can apply for affirmative asylum with an exemption

16  from the one-year deadline and that their application be adjudicated by USCIS, arises out of

17  provisions located in the asylum statute.  See 8 U.S.C. § 1158(a)(2)(E), (b)(3)(C).  Thus, these

18  aspects of the requested injunction directly implicate a non-covered provision (the asylum statute)

19  and their "one step removed" effect on a covered provision does not bring the injunction within the

20  scope of § 1252(f)(1).  See Al Otro Lado, 138 F.4th at 1125.  The court need not, however,

21  consider aspects of plaintiffs' requested injunction where vacatur already provides an adequate

22  remedy for the harm.  See Monsanto, 561 U.S. at  165-66, 130 S.Ct. at 2761.  The court thus

23  declines to consider plaintiffs' request to enjoin the Policy or require placement in new § 240

24  proceedings, as vacatur of the Policy will ensure that the government does not subject MPP-

25  unaccompanied children to prior proceedings.

26      The government also argues that plaintiffs' requested injunction would enjoin or restrain the

27  operation of §§ 1229, 1229a, 1229c and 1231, because it would require DHS to commence

28  removal proceedings, prohibit DHS from prosecuting existing removal proceedings, and prohibit

DHS from enforcing unexecuted removal orders. (See Dkt. 309, Opp. at 1-4). The court considers each provision in turn.

First, the injunction does not restrain or interfere with § 1229, which governs the "[i]nitiation of removal proceedings." Contrary to the government's argument, (see Dkt. 309, Opp. at 2), the injunction would not prevent the issuance of NTAs. That is, the government may still issue NTAs to MPP-unaccompanied children, but it must also afford them the rights guaranteed to them by the TVPRA.

Second, the government argues that the injunction would restrain or interfere with § 1229a, which governs "[r]emoval proceedings," because it would "compel the termination/dismissal of removal proceedings" for MPP-unaccompanied children. (See Dkt. 309, Opp. at 2). It is true that where existing proceedings are pending, plaintiffs seek that MPP-unaccompanied children be placed in new proceedings. (See Dkt. 307-1, Proposed Final Judgment and Permanent Injunction at 5-6). But § 1232(a)(5)(D)(i) indicates that unaccompanied children are entitled to placement in new proceedings. See 8 U.S.C. § 1232(a)(5)(D)(i) (providing that "[a]ny unaccompanied alien child sought to be removed . . . shall be . . . placed in removal proceedings under section 240"); (Dkt. 304, Liability Order at 23) (analyzing this provision). The government does not precisely explain how this would prevent operation of § 1229a, though it presumably means to say that implicit in the authority of immigration judges under § 1229a to "conduct proceedings" is also the authority to continue these proceedings. But there is nothing in § 1229a that indicates the government must proceed with ongoing removal proceedings. Although § 1229a(a)(3) provides that "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States[,]" this is so "[u]nless otherwise specified in this chapter[,]" 8 U.S.C. § 1229a(a)(3), and the TVPRA specifies otherwise. See 8 U.S.C. § 1232(a)(5)(D)(i). Placement in new proceedings does not interfere with the government's implementation of § 1229a. MPP-unaccompanied children can be placed in removal proceedings, but they are entitled, consistent with both § 1229a and § 1232(a)(5)(D)(i), to TVPRA protections while in those proceedings. See Al Otro Lado, 138 F.4th at 1114 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to

1  their place in the overall statutory scheme.") (quoting <u>Sturgeon v. Frost</u>, 577 U.S. 424, 438, 136

2  S.Ct. 1061, 1070 (2016)).    In other words, the government may seek to remove

3  MPP-unaccompanied children, but it cannot read other provisions – which are not covered by

4  § 1252(f)(1) – out of the statutory scheme.  In any event, the court need not enjoin the government

5  from enforcing the Policy or require placement in new proceedings because vacatur of the Policy

6  remedies the issue of the government subjecting MPP-unaccompanied children to pending or prior

7  proceedings.[14]

8          Third, an injunction requiring that MPP-unaccompanied children be permitted to seek

9  voluntary departure does not enjoin or restrain the operation of § 1229c or the Attorney General's

10 discretion, (<u>see</u> Dkt. 309, Opp. at 3), as the decision to grant such relief still rests with the Attorney

11 General.  The injunction would merely require that MPP-unaccompanied children be allowed to

12 seek such relief, not that it be granted.

13         The remaining provisions of plaintiffs' requested injunction do not run afoul of § 1252(f)(1).

14 Requiring the government to:  (1) adopt safeguards to ensure that MPP-unaccompanied children

15 are able to apply for affirmative asylum with USCIS and seek voluntary departure; (2) adopt

16 safeguards to identify MPP-unaccompanied children and notify them, ORR, plaintiffs and their

17 counsel of the MPP-unaccompanied children's status; (3) publish guidance about the adopted

18 safeguards; and (4) file status reports regarding compliance will remedy the lack of meaningful

19 access to TVPRA protections without enjoining or restraining any of the provisions in

20 § 1252(f)(1).[15]  <u>See</u>, <u>e.g.</u>, <u>Al Otro Lado</u>, 138 F.4th at 1127 (9th Cir. 2025) (concluding that an

21 injunction "requir[ing] the Government to identify possible P.I. class members and notify them

22 about their class membership and the significance of the injunction" was "permissible under

23

_____

24        [14]  Similarly, an injunction that would prevent the government from enforcing unexecuted
25 removal orders against MPP-unaccompanied children, (<u>see</u> Dkt. 309, Opp. at 2-3), is unnecessary
26 because vacatur of the Policy prevents the government from subjecting MPP-unaccompanied
   children to their prior removal orders.

27        [15]  The government cannot and does not argue that the notice and identification provisions of
   plaintiffs' requested injunction are barred.  (<u>See</u>, <u>generally</u>, Dkt. 309, Opp.); <u>see</u>, <u>e.g.</u>, <u>Al Otro</u>
28 <u>Lado</u>, 138 F.4th at 1127 (affirming notice and identification provisions of an injunction).

§ 1252(f)(1)" because "[t]hose requirements do not enjoin or restrain the operation of any covered provision") (internal quotation marks omitted).

In order to afford complete relief to plaintiffs, the injunction must provide safeguards and notice to all MPP-unaccompanied children. The government's APA and due process violations deny plaintiffs access to prospective and current clients; these violations have seriously impaired plaintiffs' provision of legal services by preventing plaintiffs from identifying and developing attorney-client relationships with MPP-unaccompanied children. Under the TVPRA, these children are entitled to counsel to the greatest extent practicable, 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5), but plaintiffs are often unable to adequately screen these children – let alone form an attorney-client relationship – when the government fails to identify their clients and seeks to immediately deport them. Because there is no functional way to separate out MPP-unaccompanied children who will necessarily become plaintiffs' clients from those who will not, the injunction must apply to the government's actions with respect to all MPP-unaccompanied children in order to afford plaintiffs the relief to which they are entitled. (See Dkt. 307, Plaintiff's Post-Trial Remedies Brief at 11) ("Plaintiffs are not 'geographically limited' because their unaccompanied child client base is not geographically limited."); see also CASA, 145 S.Ct. at 2557 ("[W]hile the court's injunction might have the *practical effect* of benefitting nonparties, that benefit [is] merely incidental.") (internal quotation marks omitted).

In sum, the court finds that the government's existing practices are inadequate to ensure that the government provide MPP-unaccompanied children with meaningful access to their TVPRA rights, including being able to apply for affirmative asylum on an extended timeline, and to seek voluntary departure. (See Dkt. 304, Liability Order at 29-30); supra at § II.C.1. The court has also determined that the government's practice of failing to notify MPP-unaccompanied children and seeking to deport them before they have an opportunity to rely on their TVPRA protections deprives them of their rights under the TVPRA and therefore, of due process. (See Dkt. 304, Liability Order at 29-30); supra at § II.C.1. In short, the court will enter a permanent injunction, as set forth below, requiring additional safeguards to ensure that MPP-unaccompanied children have a meaningful opportunity to access these protections.

## CONCLUSION

Based on the foregoing, and for the reasons set forth in the Court's Liability Order (Dkt. 304), IT IS ORDERED THAT Judgment shall be entered as follows in favor of plaintiffs as to their claims under the APA and the Due Process Clause of the Fifth Amendment of the United States:

I.      VACATUR.

The government's Policy, as described above and in the Court's Liability Order, is hereby vacated and set aside.

II.     DECLARATORY RELIEF.

In accordance with the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the court **finds and declares** as follows:

A.      The government's Policy violates the APA and the Due Process Clause of the Fifth Amendment of the United States Constitution.  (See Dkt. 304, Liability Order at 23-30).

B.      The TVPRA entitles all unaccompanied children, including MPP-unaccompanied children, to:

1.      access to counsel to the greatest extent practicable, see 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5);

2. exemption from the one-year deadline to apply for asylum and extended timelines to develop claims for immigration relief, see 8 U.S.C. § 1158(a)(2)(E);

3.      the processing of asylum claims in the first instance through affirmative applications adjudicated by USCIS in a nonadversarial process, see 8 U.S.C. § 1158(b)(3)(C);

4.      placement in § 240 proceedings if the government seeks to remove them, notwithstanding a prior pending proceeding or removal order in which they were not unaccompanied children, see 8 U.S.C. § 1232(a)(5)(D)(i); and

5.  the opportunity to seek voluntary departure, see 8 U.S.C. § 1232(a)(5)(D)(ii).

C.      The TVPRA provides unaccompanied children, among other things, access to counsel to the greatest extent practicable, exemption from the one-year deadline to seek asylum, a guarantee of initial adjudication of their asylum application by USCIS, and placement in § 240

1  proceedings if the government seeks to remove an unaccompanied child. See 8 U.S.C.

2  § 1158(a)(2)(E), (b)(3)(C); 8 U.S.C. § 1232(a)(5)(D)(ii)-(iii).  In order for the TVPRA's protections

3  to remain viable and existent in practice, the government must provide MPP-unaccompanied

4  children a meaningful opportunity to access these rights.  Because the TVPRA provides that MPP-

5  unaccompanied children will have more than a year to seek asylum, the government may not seek

6  to remove MPP-unaccompanied children on a rapid timeline before they have a meaningful

7  opportunity to access their rights under the TVPRA.  See United States v. Melendez-Castro, 671

8  F.3d 950, 954 (9th Cir. 2012) (finding the right to receive information regarding voluntary departure

9  to be a constitutionally protected interest and the deprivation of a genuine opportunity to apply to

10  be due process violation).

11          D.    Due process requires that unaccompanied children and their counsel receive

12  reasonable notice of prior MPP ties in order to help facilitate the children's access to TVPRA

13  protections.  The government's failure to, among other things, provide notice to MPP-

14  unaccompanied children of their status, and its practice of moving to quickly deport them, deprives

15  MPP-unaccompanied children of a meaningful opportunity to access TVPRA protections, thereby

16  violating the Due Process Clause.

17          E.    The government may not attempt to or otherwise execute a prior removal order

18  against an MPP-unaccompanied child, without first providing the child an opportunity to access

19  the protections set forth above, including the right to apply for asylum as an unaccompanied minor.

20  See Velasquez-Castillo v. Garland, 91 F.4th 358, 362 (5th Cir. 2024) ("Velasquez-Castillo met the

21  requirements of the TVPRA when he filed his subsequent asylum claim, which is still pending.

22  Application of the TVPRA to this case would invalidate the existing removal order and provide an

23  alternative pathway for Velasquez-Castillo to pursue his asylum claim.").

24  III.    PERMANENT INJUNCTION.

25          Permanent injunctive relief, as set forth below, is intended to remedy plaintiffs' injuries and

26  to prevent defendants' further violations of, and to help ensure their compliance with, the TVPRA

27

28

and the Due Process Clause in their encounters with MPP-unaccompanied children.  Accordingly, the court hereby enters the following permanent injunction:[16]

A.      TVPRA Safeguards.  The court expects that the government will take steps and make efforts to ensure that MPP-unaccompanied children, like all unaccompanied children, are afforded the greater protections provided by the TVPRA.  See Flores v. Sessions, 862 F.3d 863, 880 (9th Cir. 2017) ("The overarching purpose of the . . . TVPRA was quite clearly to give unaccompanied minors more protection, not less.").  At a minimum, the government shall adopt safeguards to ensure that MPP-unaccompanied children: (1) have access to counsel to the greatest extent practicable; (2) have a meaningful opportunity to apply for affirmative asylum with USCIS on an extended timeline, given their exemption from the one-year deadline; (3) have their asylum claims processed in the first instance by USCIS; and (4) can seek voluntary departure. See 8 U.S.C. § 1158(a)(2)(E), (b)(3)(C); 8 U.S.C. § 1232(a)(5)(D)(i)-(iii).  The government shall take concrete measures and actions to ensure that MPP-unaccompanied children have a meaningful opportunity to access TVPRA protections before the government seeks to remove them.  This could include, for example, not rushing to remove MPP-unaccompanied children, and communicating with their counsel to ensure that the children are given a meaningful opportunity to apply for affirmative asylum on an extended timeline.

To afford the government flexibility in implementing this injunction, the court will not define the exact contours of the additional safeguards.  Nor will the court define precisely what constitutes a meaningful opportunity to access TVPRA protections; it suffices to say that MPP-unaccompanied children must be provided a meaningful opportunity to access these rights. For instance, the TVPRA envisions that children will have extended timelines to develop and present asylum claims – their exemption from the one-year deadline to apply for asylum means that the children should have extended timelines, i.e., at least more than a year to do so.  Rushing to remove a child in a matter of days or weeks would not comply with the injunction.  Any efforts

---

[16]  Defendants' request that the court stay any injunction for 60 days is denied.

to remove children must comply with the TVPRA and the procedural safeguards set forth in this Order.

B.    <u>Identification and Notice Safeguards</u>.  The government shall adopt safeguards and take steps to identify MPP-unaccompanied children encountered by defendants, and provide adequate and timely written notice of an unaccompanied child's MPP status to the child, the ORR shelters in which any such children are housed, and plaintiffs.[17]

C.    <u>Guidance on Procedures and Safeguards</u>.  The government shall publish guidance on the procedures applicable to MPP-unaccompanied children, including the practices and safeguards adopted pursuant to the Court's Judgment and Permanent Injunction to ensure that MPP-unaccompanied children have meaningful access to their rights under the TVPRA.  No later than 30 days from the filing of the Judgment, the parties shall propose a timeline for the publication of such guidance.

D.    <u>Status Report</u>.  The government shall file a Status Report every six months regarding compliance with the court's Judgment.  The Status Report shall, at a minimum, include information regarding:  (1) the relevant safeguards in effect and defendants' compliance with those safeguards; (2) the number of MPP-unaccompanied children encountered; (3) whether notice was provided to such children, plaintiffs' counsel, and the ORR shelters; and (4) whether any such children have been removed without being afforded the safeguards described in this Order.  The first Status Report shall be filed no later than six months from the filing date of the Court's Judgment.

E.    <u>Jurisdiction and Disputes Relating to Injunction</u>.  The court shall retain jurisdiction over this matter to enforce and resolve any disputes concerning the terms of, and defendants' compliance with, the Court's Judgment, and to hear any application by plaintiffs for attorney's fees and costs.  In the event the parties have a dispute concerning the requirements of the Court's Judgment or the meaning of any terms therein, they shall promptly meet and confer in a good faith

---

[17] Plaintiffs may designate a representative or representatives to receive notice on their behalf.

attempt to resolve the dispute.  If those efforts do not succeed, the parties shall promptly present the dispute to the court for resolution.

Dated this 29th day of September, 2025.

                                        /s/
                              Fernando M. Olguin
                              United States District Judge